569 So.2d 67 (1990)
Alvin J. ROUSSEL
v.
Robert T. SHARP, Jr., M.D. and St. Paul Fire and Marine Insurance Company.
No. 89-CA-1613.
Court of Appeal of Louisiana, Fourth Circuit.
October 11, 1990.
*69 R. Ray Orrill, Jr., Orrill, Shearman & Cordell, New Orleans, for plaintiff-appellant.
Robert E. Birtel, Trial Atty., Margaret Bradley, Law Offices of Robert E. Birtel, New Orleans, for defendants-appellees.
Before CIACCIO, WILLIAMS and PLOTKIN, JJ.
WILLIAMS, Judge.
This appeal arises out of a medical malpractice action by plaintiff, Alvin J. Roussel, against defendant, Robert F. Sharp, Jr., M.D., a urologist. Dr. Sharp's insurer, St. Paul Fire & Marine Ins. Co., was also named as a defendant. The trial court ruled in favor of defendants, and plaintiff appeals.
The issues before this Court are (1)(a) whether the trial court erred in disallowing testimony concerning the necessity for surgery where that issue was raised for the first time at trial;[1] (b) whether the record supports a finding that the defendant adequately informed plaintiff of material risks associated with the surgery to which plaintiff consented and, if not, whether a reasonable person in the plaintiff's position would have consented to the operation if full disclosure had been made; and (2) whether the record supports the trial court's finding that plaintiff failed to sustain his burden of proving that defendant's actions in treating plaintiff were not in conformity with the standard of care in the medical specialty of urology.
As to the first issue, which arises from plaintiff's claim under the Uniform Consent Law, we hold that the trial court erred in disallowing testimony as to the necessity of plaintiff's surgery, to the extent that this testimony was relevant in determining plaintiff's condition and thus, determining the materiality of the risks involved in plaintiff's surgery as well as the causation element of plaintiff's claim for damages resulting from defendant's failure to disclose the risks. However, after reviewing all of the testimony, we conclude that the complication encountered in this case, i.e., perforation of the neck of the bladder with consequent extravasation of fluid into the peritoneal cavity, was not a material risk requiring disclosure. Moreover, even if the risk were material and required disclosure to the patient, plaintiff in this case failed to prove the causation element of his claim, i.e., that a reasonable person in plaintiff's position would not have consented to the surgical procedure if full disclosure had been made. Next, we hold that plaintiff failed to prove that defendant's actions in the management of plaintiff fell below the standard of care of urologists. Therefore, we affirm the judgment of the trial court.

Facts
On Feb. 21, 1984, plaintiff (then 74 years old) underwent a transurethral resection ("TUR"), a surgical procedure to remove part or all of an enlarged prostate gland *70 and thereby relieve blockage of the urethra.[2] The TUR was performed by Dr. Sharp with the use of a resectoscope which was inserted into the patient's urethra. A resectoscope is a hollow tubular instrument that contains a telescope and a fine wire loop at the end which is used for cutting tissue. The resectoscope also allows fluid into the operating field to wash out the accumulation of blood and cut tissue.
Prior to surgery on the morning of the procedure, plaintiff complained of nausea, which was determined to be from the pre-operative medications. At 9:20 a.m., plaintiff was nauseated, cold and diaphoretic (sweaty), again a result of pre-operative medications. The nausea subsided, and the anesthesiologist administered to plaintiff a spinal anesthesia in preparation for the surgery. A spinal allows the patient to remain conscious and responsive during the surgery.
At approximately 9:40, defendant commenced the procedure, starting with partial resection of the median lobe of the prostate. Shortly thereafter, sometime between 9:40 and 10:10, plaintiff demonstrated signs of mild restlessness and nausea, both symptoms that plaintiff had had before the surgery began. Plaintiff's blood pressure was stable. Plaintiff's abdomen became tender and slightly distended, and defendant became concerned about the possibility of a perforation with extravasation (i.e., the passing of a body fluid out of its proper place). Defendant looked through the resectoscope and saw what appeared to be a small tear or rent in the prostatic tissue, although he was unable to determine the exact nature, location and extent of the tear. Aware that a perforation could lead to extravasation of fluid from the prostatic capsule into the peritoneal space, Dr. Sharp immediately performed a cystogram[3] to confirm or refute his suspicion. The cystogram was negative, showing no signs of extravasation. At the time of completion of the cystogram (approximately 10:15), plaintiff had no complaints of nausea and was no longer restless. At no time did plaintiff complain of pain or experience a significant change in blood pressure, both indicia of perforation with extravasation. Due to all of these factors, defendant was convinced at that point that there was no extravasation and he resumed resection of the prostate. Within twenty to twenty-five minutes, plaintiff again became nauseated and restless with a slightly distended abdomen, and a change in blood pressure was noted. Defendant then concluded that there was a perforation and immediately ordered that an operating room (OR) be prepared for the placing of drains and full catheterization of plaintiff. In the meantime (about fifteen minutes), defendant remained with plaintiff, cauterizing or fulgurating the "bleeders" (vessels causing bleeding) in order to maintain control of plaintiff's condition. This cauterization required some additional resectioning of prostatic tissue in order to see and reach the pertinent vessels. We note that plaintiff's bleeding, which was a problem throughout the surgery, originated in the prostatic fossa and was not caused by the perforation.
Once in the OR, defendant made a suprapubic incision down to the retroperitoneal space. With the assistance of another surgeon, a Jackson-Pratt drain and Penrose drains were placed in the peritoneal cavity to drain the extravasated fluid. A suprapubic cystostomy[4] was also performed and a catheter placed in the bladder for drainage from the bladder out through an abdominal opening.
Once in the recovery room, it was noted that plaintiff's urine was bloody. Therefore, he was returned to the OR and, through the same suprapubic incision, Dr. *71 Sharp packed with gauze the prostatic fossa (the cavity left after removal of the prostate), which was determined to be the source of the bleeding. Plaintiff was placed in the intensive care unit (ICU) for one to two days for close observation, although Dr. Sharp did not consider his condition critical. Plaintiff did well during this time. The packing in the prostatic cavity was gradually removed over the next few days. Plaintiff's urine remained clear.
At this point, plaintiff was equipped with an indwelling Foley catheter and the suprapubic catheter from the bladder out through the abdomen, which provided an alternate route for the urine to evacuate the bladder until the patient was able to void through the urethral catheter and eventually through an uncatheterized urethra. Plaintiff continued to drain suprapubically for a week to ten days after the gauze packing was removed. Plaintiff should have begun voiding through the urethral catheter within a few days, and Dr. Sharp determined that his slow progress in this regard was due to a spastic bladder which forced the urine through the shortest, least resistant pathway. The spasticity was a result of plaintiff's longstanding (a matter of years) prostatic obstruction. The testimony established that, in order to compensate for plaintiff's prostatic obstruction prior to surgery and force urine flow through the urethra, the muscular bladder wall had thickened over time and had lost its elasticity. Thus, plaintiff's bladder spasms after surgery were directly related to this condition.
On March 9, 1984, because plaintiff continued to drain suprapubically, defendant reopened the abdomen to ensure that the urethral catheter was in place and then closed the abdominal wound. Although plaintiff drained a bit longer through this wound, it healed shortly thereafter, and plaintiff began voiding normally. The indwelling catheter was removed, and plaintiff has no residual ill effects of the surgery.
Plaintiff filed suit against Dr. Sharp and Dr. Sharp's insurer, St. Paul Fire & Marine Insurance Company. The petition alleged that Dr. Sharp failed to adequately inform plaintiff of the risks associated with the surgery and that Dr. Sharp was negligent in his performance of the TUR. At the trial, counsel for plaintiff attempted to elicit expert testimony regarding whether surgery was warranted or necessary in plaintiff's case. The trial court sustained defendant's objection, but allowed the proffer of this testimony. After trial, judgment was rendered in favor of defendant. Plaintiff filed this appeal.

Assignment of Error No. 1
Plaintiff contends that the trial court erred in finding for defendant on the issue of informed consent where the record shows that defendant did not specifically inform plaintiff of the risk of perforation with extravasation. In connection with this specification, plaintiff also argues that the trial court erred in disallowing testimony as to plaintiff's pre-operative condition and the necessity for surgery, relevant factors in plaintiff's evaluation of his available options before consenting to the TUR.
First, plaintiff attempted at trial to elicit expert testimony concerning unnecessary surgery, an issue which was neither pleaded in the petition nor raised before trial. Although defense counsel objected, plaintiff's counsel did not request permission to amend his pleadings under LSA-C. C.P. art. 1154. The trial court sustained defendant's objection to the testimony but allowed the testimony to be proffered.
The trial court was within its discretion in disallowing this testimony to the extent that it went to the issue of unnecessary surgery as a separate cause of action and thus was expanding the pleadings. However, the trial court erred in disallowing testimony concerning the necessity for surgery insofar as that testimony was relevant to plaintiff's pre-operative condition and thus, a determination of 1) the materiality of the risk involved and 2) whether causation was established between the lack of information regarding the risk of perforation and plaintiff's damages. Nevertheless, we hold that the risk of perforation was not a material risk in this case and, even if it were, plaintiff failed to prove that *72 a reasonable person in his condition would not have consented to the TUR had he known of that risk.
The jurisprudential rule concerning informed consent requires that the treating physician disclose to the patient all risks which are "material," so that the patient has sufficient information to make an informed and intelligent decision of whether to consent to a proposed surgical procedure. Hondroulis v. Schumacher, 546 So.2d 466, 469 (La.1989), republished at 553 So.2d 398, 410 (1988).
The determination of materiality is a two-pronged test which establishes an objective, reasonable man standard in order to protect the physician from aberrational decisions on the part of the patient. First, the existence and nature of the risk must be determined, along with the likelihood of its occurrence. This is established through expert testimony. Second, the trier of fact must determine whether a reasonable person in plaintiff's condition would attach significance to that risk, considering the incidence of the particular injury and the degree of harm (thus, the relevance of the proffered testimony in this case). Id. at 470.
Furthermore, even if the undisclosed risk is found to be material, the plaintiff must prove a causal relationship between the doctor's failure to disclose the material information and the patient's damage. Id.; LaCaze v. Collier, 434 So.2d 1039, 1048 (La.1983). Causation is also determined by an objective standard: whether a reasonable person in the patient's position would have consented to the operation if full disclosure had been made. Id. Several factors are considered in making this determination, including 1) condition of the patient and need for treatment (thus, the significance of the proffered testimony in this case); 2) the seriousness of the risk; and 3) the likelihood of its occurrence. LaCaze v. Collier, 434 So.2d at 1048.
In the instant case, the plaintiff testified that Dr. Sharp did not inform him of the risk of perforation with extravasation. Dr. Sharp did not refute this.
The expert testimony showed that the risk of perforation with extravasation was a known risk but occurs in less than 1% of TUR's performed.[5] It was further established that, although the complication can have dire consequences if left unattended, it can be corrected with good results when detected and treated in time.
Plaintiff's pre-operative condition was also established. Plaintiff had a history of problems with his prostate dating back to 1969. He began seeing defendant in 1982, complaining of frequency and urgency associated with urination. Several times in 1983-84, defendant observed plaintiff's urine flow rate, which he noted to be "extremely weakened and slow." Dr. Sharp performed a cystoscopy through which he observed an obstruction to the urethra by the prostate. Dr. Sharp also tested for residual urine in the bladder and found twenty or twenty-two cc's. The record establishes that the mere presence, rather than the amount, of residual urine is significant because it shows that the patient's bladder is unable to overcome the urethral obstruction. In plaintiff, the muscles of the bladder had become enlarged in their attempt to compensate for the obstruction and had lost much of their elasticity, resulting in plaintiff's symptoms of frequency and urgency. By late 1983, plaintiff had little control over his urine flow and wanted something done to correct it. Informed that a prostetectomy was imminent, plaintiff opted to have the procedure done in February, 1984.
Under the test set forth by the Supreme Court, we conclude that a patient in plaintiff's condition would attach little significance to the risk of perforation, which is not only extremely infrequent but rarely causes severe harm. Accordingly, the risk was not a material one requiring disclosure in plaintiff's case.
*73 Even if the risk were material, plaintiff failed to sustain his burden of showing a causal relationship between defendant's failure to disclose the risk and plaintiff's harm, i.e., plaintiff failed to prove that a reasonable person in his position would have refused surgery had he known of the risk.
The record establishes that plaintiff's symptoms were severe. He experienced frequency and urgency problems and had lost control of his urinary function. Plaintiff had stated that he could not take the condition any longer and had to have something done. Further, plaintiff's own expert testified that he had done XXXX-XXXX TUR's, had informed every TUR candidate of the risk of perforation with extravasation, and had never had a patient refuse the surgery on the basis of this risk. When plaintiff's condition is considered in light of the infrequency of perforation and the good prognosis when a perforation is corrected, we cannot say that a reasonable person in plaintiff's condition would not have consented to the surgery had he known of the risk.

Assignment of Error No. 2
Plaintiff contends the trial court erred in holding that plaintiff failed to sustain his burden of proving that defendant fell below the standard of care of urologists in his treatment of plaintiff. This assignment is without merit.
LSA-R.S. 9:2794 sets forth the plaintiff's burden of proof in a medical malpractice action against a physician practicing in a particular specialty where the alleged acts of medical negligence raise issues peculiar to that specialty. Under that statute, the plaintiff has the burden of proving "the degree of knowledge or skill possessed ... or the degree of care ordinarily practiced by physicians ... within the involved medical specialty...." LSA-R.S. 9:2794(A)(1). Additionally, the plaintiff must prove "that the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment, in the application of that skill...." LSA-R.S. 9:2794(A)(2). Further, plaintiff must also prove causation. LSA-R.S. 9:2794(A)(3). After a careful review of the record, we conclude that the trial court was correct in holding that plaintiff failed to sustain his burden of proof.
First, plaintiff asserts that the mere occurrence of the complication constituted a breach of the accepted standard of care. The record does not support this claim.
Plaintiff's witness, Dr. Donald Neese, made a conclusory statement that, absent some intervening cause, it would absolutely be a breach of the required standard to have a perforation during a TUR. However, both of defendant's experts refuted this, indicating that perforation is a complication which occurs even in ideal circumstances under the utmost care. Both stated that they saw no evidence in this case to show that defendant breached the standard required of urologists when the perforation occurred.
Dr. Harry Zengle, Jr., an expert in urology, testified that the risk of perforation with extravasation is always present during a TUR. While he stated that perforation is a very rare complication, Dr. Zengle opined that a physician would have to be "better than the rest of us, or lucky, or not do a complete operation not to have some extravasation someplace along the line with two thousand operations." [Emphasis added.] After reviewing the facts of this case, Dr. Zengle concluded that Dr. Sharp did not fall below the standard of care for urologists. Dr. Jerry W. Sullivan, an expert in urology and head of the Urology Department at Louisiana State University Medical Center, testified that perforation with extravasation is an unfortunate complication, but that its occurrence does not in and of itself indicate a breach of the standard of care. He stated that, given the facts of this case, Dr. Sharp did not breach that standard.
Next, plaintiff contends that defendant breached the standard of care in failing to recognize the symptoms of perforation with extravasation exhibited by plaintiff during the procedure. This claim is without merit.
*74 Nondefinitive indicia of perforation with extravasation include nausea, restlessness, distention of the abdomen. However, the testimony established that nausea is "not a specific thing," and is usually caused by pre-operative medications. Additionally, slight distention of the abdomen can be caused by abdominal gas. Dr. Sullivan testified that, in fact, all three of these symptoms are common results of a spinal anesthetic alone. Drs. Zengle and Sullivan testified that more definitive indicia of perforation with extravasation include significant pain, significant change in blood pressure, and significant change in pulse rate.
In this case, plaintiff exhibited mild nausea and restlessness. However, both of these symptoms were experienced by plaintiff periodically prior to commencement of surgery as a result of pre-operative medications. Significantly, plaintiff did not at any time during the TUR complain of pain. Further, no significant change in blood pressure was noted until just before plaintiff was taken to the OR. In fact, Dr. Sullivan testified and the medical records establish that plaintiff's blood pressure remained relatively stable throughout the procedure. The record shows that Dr. Sharp closely observed plaintiff's symptoms and diligently responded. Both of defendant's experts testified that defendant acted promptly and appropriately in response to the symptoms exhibited by plaintiff in the course of the TUR.
Next, plaintiff asserts that defendant breached the standard of care by resecting the median lobe of the prostrate in its entirety before resecting either lateral lobe. This is not supported by the record.
Plaintiff's expert, Dr. Neese, testified that Dr. Sharp breached the standard of care when he resected the median lobe first in its entirety. However, Dr. Sharp testified that he began with the median lobe, completed partial resection of it, and then moved to the left lateral. In any case, the record shows without doubt that TUR is an individualized procedure, and it is the choice of the attending surgeon as to which lobe to begin with in the resection. In this case, defendant testified that plaintiff's median lobe was enlarged, increasing the need to resect that lobe first. This method was entirely consistent with the medical literature read into the record, as well as the preponderance of the expert testimony.
Next, plaintiff contends that defendant breached the standard in continuing to resect the prostate even after he suspected a perforation and visualized a tear through the resectoscope. This contention is without merit.
When defendant suspected a perforation with extravasation, he looked through the resectoscope and visualized what appeared (and was later confirmed) to be a tear, although he could not determine its nature or extent. He immediately performed a cystogram, an appropriate action according to both of defendant's experts. Dr. Zengle testified that although a cystogram is not entirely reliable in confirming the presence or absence of a perforation, it is the "best test we have." Dr. Sullivan corroborated this testimony. When the cystogram was negative, defendant continued with the resection until plaintiff's condition convinced him that there must be a perforation. At that time, Dr. Sharp immediately ordered preparation of the OR. Contrary to plaintiff's contention, defendant did not simply continue the resection before transferring plaintiff to the OR, but resected to the extent necessary to find, reach and cauterize the bleeders. The record supports the trial court's finding that plaintiff's actions were in conformity with the standard of care of urologists.
Finally, plaintiff contends that the defendant breached the required standard of care because he failed to respond to the request of plaintiff's wife (now deceased) and daughter that he obtain a second opinion. This contention is without merit.
The record shows that the wife and daughters asked defendant whether it was necessary to obtain a second opinion, and he told them no, that plaintiff needed time to heal. Although one of plaintiff's daughters testified that she and her mother specifically requested a second opinion of Dr. Sharp, her testimony was inconsistent, as *75 she had previously testified that they merely asked if a second opinion was necessary.
Accordingly, the trial court did not err in holding that plaintiff failed to sustain his burden of proving that defendant fell below the standard of care required of urologists.
For the foregoing reasons, the trial court erred in disallowing testimony concerning the necessity of plaintiff's surgery, but only to the extent that it was relevant in determining plaintiff's pre-operative condition and thus, the materiality of the risks involved in the surgical procedure and the causation element of plaintiff's claim for damages allegedly caused by defendant's failure to disclose all of the risks. However, we hold that the complication of perforation with extravasation was not a material risk requiring disclosure in this case, and that, even if it were, plaintiff failed to prove causation. Additionally, we hold that plaintiff failed to prove that defendant either lacked the degree of skill or knowledge possessed by urologists or failed to use reasonable care in the application of that skill. Accordingly, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] The trial court allowed the proffer of this testimony.
[2] The urethra is the opening from the bladder to the outside of the body. The prostate consists of three sections or lobes, the median, left lateral, and right lateral lobes, and surrounds a portion of the urethra near the neck of the bladder.
[3] A cystogram is a radiograph (X-ray) of the bladder made after the injection of a contrast medium (dye) which can then be detected if it passes through the perforation and out of its proper space.
[4] A cystostomy is the surgical formation of a fistulous opening in the urinary bladder wall.
[5] In XXXX-XXXX TUR's performed by Dr. Sharp, this complication has arisen only two to four times.