558 So.2d 1342 (1990)
Jake PALERMO, et al.
v.
NME HOSPITALS, INC., d/b/a Jo Ellen Smith Medical Center.
No. 89-CA-0390.
Court of Appeal of Louisiana, Fourth Circuit.
March 14, 1990.
*1343 Robert A. Caplan, Lewis & Caplan, New Orleans, for plaintiffs-appellants.
Daryl A. Higgins, Gretna, and Windhorst, Gaudry, Talley & Ranson, Harvey, for defendant-appellee.
Before SCHOTT, C.J., and CIACCIO and ARMSTRONG, JJ.
ARMSTRONG, Judge.
This is a suit for wrongful death arising out of the tragic death of Lucille Palermo, apparently the result of her jumping out of the fourth floor window of her hospital room. Suit was filed by her surviving husband, Jake Palermo, and three major daughters, Robin May, Frances Williams, and Sheila White, against defendant, NME Hospitals, Inc. (NME), which owned and operated Jo Ellen Smith Medical Center, in whose care the decedent was in at the time of her death. At the close of plaintiffs' case-in-chief the trial court granted a directed verdict in favor of defendant. Plaintiffs now appeal.
The record reflects that on April 15, 1983 Mrs. Palermo was admitted to Jo Ellen Smith Medical Center for treatment of depression and Parkinson's disease. Mrs. Palermo had suffered with Parkinson's disease for the past nine years, and increasingly, with depression. She had attempted to commit suicide on two occasions within the six weeks preceding her admittance to the hospital.
Mrs. Palermo was initially hospitalized in the psychiatric unit of the hospital. She was hospitalized primarily for treatment of her depression, which was characterized as "major." Her treating psychiatrist at the hospital was Dr. Wayne E. Julien. Dr. Julien testified that the decedent had a long history of anxiety and depression, but that there had been no suicidal behavior prior to the two attempts in the six weeks preceding her hospitalization.
Dr. Julien ordered that the decedent be placed on a suicide watch for the first forty-eight hours after her admittance. Because there was no evidence of suicidal behavior she was thereafter placed on close observation. Dr. Julien testified that the decedent exhibited no suicidal ideation or intent while in the psychiatric unit. While there he placed Mrs. Palermo on anti-depressant medication.
Shortly after her admittance a joint decision was made by Dr. Julien, Dr. Mohnot, a neurologist, and the staff of the hospital, to transfer Mrs. Palermo to the medical/surgical unit, or general hospital, where she could receive more intensive treatment for her Parkinson's disease. The decedent's family was consulted about the transfer and supported the decision.
Although he testified that he would have still labeled her depression as dangerous, Dr. Julien noted that the decedent seemed relieved and less anxious, knowing that she was to be transferred to the general hospital. He said that she was actually enthusiastic about the move.
Upon her transfer to the general hospital on April 20, 1983, Mrs. Palermo was placed in a room located on the fourth floor. The room had a window, apparently a normal *1344 type of window in this hospital, which could be fully opened. The only physician's order that accompanied decedent's transfer was one requiring that all four bed rails be up on her bed at all times. According to Dr. Julien, this was apparently ordered by Dr. Mohnot to prevent the plaintiff from falling out of bed. Decedent's family arranged for someone, a family member, to be with her twenty-four hours a day for companionship and assistance, particularly to help her get to the bathroom.
Mrs. Palermo preferred to sleep on a couch or type of day bed which was located in her room, while her sitter slept in her hospital bed. This became a routine practice and the nursing staff was aware of it; it was written in her chart. Fifteen days after her transfer to the general hospital Dr. Julien determined that Mrs. Palermo was ready to go home. She was to be discharged on May 6, 1983. Dr. Julien felt that she was responding well to treatment, both for her depression and her Parkinson's disease, and could safely return home to her family. He said that as of the day before her discharge, May 5th, the decedent seemed less depressed, had a more positive attitude about things, and was excited about going home.
A nurse, Julie Gravois, saw the decedent at approximately eleven thirty on the night of May 5th. She said that Mrs. Palermo was lying on the couch awake and told her she felt wonderful and was happy about being discharged the next morning. The sitter woke up and commented on how happy Mrs. Palermo was about going home the next day and being home for Mother's Day. Nursing charts reflect that the decedent was observed by Ms. Gravois sleeping on the couch at one, two, three, and four A.M. on the morning of May 6, 1983. At these times her sitter was also observed asleep in the patient's bed, except at the four A.M. check when the sitter was talking at the nurse's station. At a check made at ten minutes to five A.M. only the sitter was asleep in the room. The window was observed open and the decedent was discovered dead on the concrete below.
Plaintiffs presented an expert witness in the field of nursing care, Ann Crawford, who testified that in her opinion it fell below the standard of care to assign the decedent to the fourth floor room. She said that she has never worked in a hospital that would allow a patient with a history like decedent's to be assigned a room "like that." She further testified that the hospital records reflected that no effort was made to consult with a nursing supervisor or a physician as to whether any special precautions should have been taken in assigning a room to the decedent. It was her opinion that the patient's history, contained in hospital records, should have been considered by the admit clerk when making the room assignment.
Ms. Crawford also stated that in every hospital she had worked in, the windows had restricted openings. That is, the windows could only be opened, for example, six inches. Commenting on the physician's order that all four side bed rails be up at all times when the decedent was in bed, Ms. Crawford confirmed the obvious, that this would have made it more difficult for her to get out of the bed.
Norma Ronstead was a director of nursing at Jo Ellen Smith Medical Center in 1983 at the time of the decedent's stay. She was not involved in making the decedent's room assignment but stated that whether or not the windows could be fully opened would not have influenced her decision in placing the decedent in a particular room. She emphasized that there were no physician's orders regarding the room assignment, except to notify Dr. Julien of the room number. This to her would indicate that Mrs. Palermo could be placed wherever it was convenient in the hospital.
Lawrence U. Dwyer, Jr. was qualified as an expert in the field of architecture. He testified that over the last twenty years, fifteen to twenty percent of his business involved hospital-related work. He testified that the windows in Jo Ellen Smith Medical Center at the time of Mrs. Palermo's death met the requirements of Louisiana *1345 state law for fire protection. They were capable of being opened from the inside without the use of a key or tool. Other than that, there were apparently no statutory requirements for the windows. He stated that there are windows available which may only be opened a certain distance, normally six inches, without the use of a special key. He said that he didn't know of any hospitals other than Jo Ellen Smith which did not have window restrictions.
Dr. Julien testified that he did not feel that Mrs. Palermo was suicidal or he would not have written her up for discharge on May 6th. He felt that the "body of evidence" suggested that she was responding well and could return safely home to her family.
Based upon the above evidence the trial court directed a verdict in favor of defendant. Plaintiffs claim such action was in error.
La.C.C.P. art. 1810 gives a trial court the authority to direct a verdict in favor of the defendant at the close of plaintiffs' case. Hastings v. Baton Rouge General Hospital, 498 So.2d 713 (La.1986); Matranga v. Sara Mayo Hospital, 463 So.2d 632 (La. App. 4th Cir.1984), writ denied, 467 So.2d 540 (1985).
However, a directed verdict should only be granted when the facts and inferences point so strongly in favor of one party that the court believes that reasonable people could not arrive at a contrary verdict. It is appropriate, not simply where there is a preponderance of evidence, but only when the evidence overwhelmingly points to one conclusion. Hastings, 498 So.2d at 718; Scott v. Hospital Service District No. 1, Parish of St. Charles, 496 So.2d 270 (La.1986).
Plaintiffs bore the burden of proving that the defendant owed a duty to the decedent to protect against the risk involved, that the defendant breached that duty, that the decedent died and the plaintiffs themselves suffered an injury, and that the defendant's actions were a substantial cause in fact of the death and injuries. Smith v. State, Department of Health and Human Resources Administration, 523 So.2d 815 (La.1988).
A hospital has a duty to exercise the requisite amount of care toward a patient that the particular patient's condition may require. It is the hospital's duty to protect a patient from dangers that may result from the patient's physical and mental incapacities as well as from external circumstances peculiarly within the hospital's control. A determination of whether the hospital has breached its duty of care depends upon the particular facts and circumstances of that case. Smith, 523 So.2d at 819; Hunt v. Bogalusa Community Medical Center, 303 So.2d 745 (La.1974).
The duty spoken of above can be further defined as whether the defendant hospital owed a duty to Mrs. Palermo to prevent this type of harm (her death) from arising in this manner (suicide by jumping out of her fourth floor window). See Crowe, Anatomy of a Tort, 22 Loy.L.Rev. 903 (1976).
In the instant case Mrs. Palermo was admitted to the "general hospital" part of Jo Ellen Smith Medical Center primarily for treatment of her Parkinson's disease. While there her depression was to continue being treated by Dr. Julien. Dr. Julien testified that the decedent exhibited no suicidal ideation or behavior at all while she was in the psychiatric unit of the hospital (or the general hospital). He did not feel that she posed a suicidal threat when she was transferred. Although her history may have reflected that she had attempted suicide twice within the previous two months, the admitting department of the general hospital was not given any cautionary instructions by her treating psychiatrist, the person, who more than anyone else involved, should have known whether any special precautions should have been taken. We are unable to find that under such circumstances the hospital admitting department had a duty to assess the psychiatric *1346 state of the decedent before making a room assignment.
There was no evidence that the general hospital had any rooms with windows which had restricted openings. There was no evidence to establish that the hospital had a duty to have had windows with restricted openings installed. There was no evidence that the general hospital had any rooms on the first, second or third floors to which the decedent could have been assigned.
If the hospital and staff had a duty to insure that the decedent slept in her bed with all four bed rails up at all times, that duty only encompassed the decedent's safety insofar as she might fall out of bed or perhaps get out unattended and fall due to muscular weakness and instability caused by her Parkinson's disease. The bed rails were not ordered by Mrs. Palermo's neurologist, who was treating her for Parkinson's disease, to prevent her getting out of bed to jump from her window.
Viewing the evidence as a whole in a light most favorable to the plaintiffs, the facts and inferences overwhelmingly lead us to the conclusion that reasonable persons could not have arrived at a verdict other than one finding no negligent conduct on the part of defendant NME and Jo Ellen Smith Medical Center.
For the reasons assigned we affirm the judgment of trial court directing a verdict in favor of defendant, NME.
AFFIRMED.