572 So.2d 783 (1990)
Valerie WRIGHT
v.
Bernard HIRSCH, M.D., New Orleans General Hospital and Insurance Corporation of America.
No. 89-CA-0788.
Court of Appeal of Louisiana, Fourth Circuit.
December 20, 1990.
Writ Denied March 1, 1991.
*784 Lemle, Kelleher, Kohlmeyer, Dennery, Hunley, Moss & Frilot, Michael J. Furman, New Orleans, for defendant-appellee.
Joseph W. Thomas, Angelique A. Reed, New Orleans, for plaintiff-appellant.
Allison H. Penzato, Metairie, for defendant-appellee New Orleans Gen. Hosp.
Before GARRISON, BARRY and BYRNES, JJ.
BYRNES, Judge.
This matter was remanded from the Louisiana Supreme Court which held that the trial judge did not abuse his discretion in denying plaintiff's motion for new trial based on jury misconduct. 560 So.2d 835. We shall now consider the remaining arguments on appeal of Valerie Wright's medical malpractice action against Dr. Bernard Hirsch, his insurer, Insurance Corporation of America, and New Orleans General Hospital (New Orleans General).
A review of the record shows that on October 25, 1983, Dr. Hirsch inserted an intrauterine device (IUD) known as a Copper-7 (CU-7) into Valerie Wright at the Sub-Specialty Clinic on the third floor of the New Orleans General Hospital. In April 1984, Dr. James E. Dopson confirmed that Ms. Wright was pregnant and scheduled an ultrasound test to determine the presence of the IUD. However, the ultrasound taken in September 1984 failed to show the location of the IUD. On October 23, 1984, Ms. Wright delivered a baby girl at Touro Infirmary. On April 25, 1985, Ms. Wright was admitted in the Emergency Room of New Orleans General and thereafter, on May 2, 1985, Dr. Edward Helm and Dr. Dopson performed an exploratory laparotomy, surgically removed the IUD protruding from Ms. Wright's rectum, and repaired a recto-vaginal fistula.
On December 13, 1985, Ms. Wright filed a complaint of medical malpractice with the office of the Commissioner of Insurance pursuant to LSA-R.S. 40:1299.41 et seq. A Medical Review Board comprised of Drs. Robert Little, Dwight L. McKenna, and William J. Woessner rendered the following opinion on January 2, 1987:
As to both defendants [Bernard Hirsch, M.D. and New Orleans General Hospital] there is a material issue of fact, not requiring expert opinion, bearing on liability or consideration by the court. The only issue of negligence is whether or not informed consent was obtained from the plaintiff. There are no other issues of negligence apparant to the Panel.
Subsequently, on December 12, 1986, Ms. Wright filed her malpractice action, claiming *785 that Dr. Hirsch negligently implanted the IUD and failed to advise plaintiff of all risks and instructions concerning the use of the IUD. She alleged that New Orleans General was negligent in referring her to Dr. Hirsch and in failing to discover that the IUD was no longer in place. At the close of plaintiff's case at trial in November 1988, the trial court granted a motion for directed verdict in favor of New Orleans General on the basis that there was no evidence in the record to sustain a judgment against the hospital. Thereafter, the jury returned with a verdict in favor of Dr. Hirsch.
On appeal, Ms. Wright presents the remaining arguments as follows: (1) the plaintiff's history of severe pelvic inflammatory disease (PID) presents an absolute contraindication for insertion of an IUD resulting in negligence ipso facto; (2) the jury erred in finding that informed consent is not required before insertion of an IUD; (3) the trial court erred in granting a motion for directed verdict in favor of New Orleans General; and (4) the trial court erred in not allowing testimony of a material witness discovered during trial.

HISTORY OF SEVERE PID
Although the record does not contain Ms. Wright's medical records from Charity Hospital, she indicated that she had suffered from severe pelvic inflammatory disease when she was hospitalized and administered antibiotics intravaneously for approximately two weeks at Charity. This occurred two years prior to insertion of the IUD by Dr. Hirsch. Plaintiff claims that the package insert provided by the IUD manufacturer classifies a history of severe PID not as a relative contraindication but as a contraindication resulting in negligence ipso facto where an IUD is inserted. Dr. Hirsch contends that plaintiff's history of PID did not preclude use of an IUD in plaintiff's case.
Dr. Sarah Lain, an expert in the field of obstetrics and gynecology, testified on behalf of Ms. Wright. Dr. Lain described the method used to insert the IUD and concluded that the IUD perforated Ms. Wright's uterine wall upon insertion rather than through migration. She testified that it was below the physician's standard of care to perforate the uterine wall upon insertion of an IUD. Dr. Lain opined that the plaintiff's history of severe PID precluded use of an IUD and it was below the standard of exercising good judgment for a physician to insert an IUD in Valerie Wright's case. Dr. Lain based her conclusion on the plaintiff's history but did not see Ms. Wright's Charity record. Dr. Lain agreed that if the pelvic infection had been acute at the time of insertion of the IUD, it would be discernible upon examination. Dr. Lain was provided with the results of Ms. Wright's cervical gonorrhea culture taken by Dr. Hirsch on October 25, 1983, the date on which he inserted the IUD. The culture report showed "no growth". Dr. Lain agreed that if a routine culture shows no growth, there is no bacterial infection at that time.
Dr. Dwight McKenna, a member of the Medical Review Panel called as a witness by Ms. Wright, was qualified as an expert in general surgery. Although he stated that a history of severe PID is an absolute contraindication, he qualified that statement by adding that it was contraindicated if there was acute, active infection at the time of insertion of the IUD. Dr. McKenna testified that the Panel did not have evidence available that indicated the extensiveness of Ms. Wright's history of PID. He also stated that he believed that the examining physician was the only person who could determine whether the history of PID was severe or was a relative contraindication.
Dr. James Dobson, called as plaintiff's expert in the field of obstetrics and gynecology, quoted Dr. Hirsch's written notation on Ms. Wright's medical record at trial as follows:
This is October 25th, '83. Temperature 93.7. Blood pressure 110/80. Weight a hundred and twenty-five pounds. Chief complaint, CC, that is once [wants] IUD. Also has twenty year old gravida I para I, AB-O, two years ago had PID. Child two years [months] old. No complications. *786 Physical examination within normal limits. Copper-T, CU-7, inserted easily.
Dr. Dobson stated that a history of PID is a relative contraindication, not absolute. He noted that he would want to know the patient's history and review the extent of the pelvic inflammatory disease before he inserted an IUD. He testified that personally he would not have inserted an IUD if the PID was quite severe where the patient had been given intravenous medication. On cross-examination, Dr. Dobson agreed that it was acceptable to put an IUD in a patient with a history of pelvic inflammatory disease two years prior to presentation depending upon the clinical situation and clinical judgment of the clinician. Dr. Dobson found no evidence of acute infection when he examined the patient in April and September of 1984 prior to the birth of Ms. Wright's baby girl and to removal of the IUD.
Dr. Simon Ward, who testified on behalf of Dr. Hirsch, was qualified as an expert in obstetrics and gynecology. He asserted that it was appropriate for Dr. Hirsch to insert the CU-7 IUD under the facts of the case and that the insertion was within acceptable medical standards. He stated that plaintiff's pelvic inflammatory disease had cleared sufficiently for her to conceive and deliver two months prior to insertion and again twenty-two months after the reported infection. He noted that if there had been residual infection of some significance, Ms. Wright likely would not have conceived.
Dr. Vincent Culotta, also an expert in obstetrics and gynecology testifying on behalf of Dr. Hirsch, opined that the pelvic inflammatory disease was minimal at the time of insertion of the IUD because tubal destruction or scarring would have occurred to prevent Ms. Wright from becoming pregnant. He maintained that insertion of an IUD in Ms. Wright's case was appropriate even with an history of having PID two years previously.
Dr. Hirsch testified that he was a general practitioner experienced in non-specialized medicine at the Sub-specialty Clinic in October 1983. He saw Ms. Wright once on October 25, 1983. According to the IUD package insert quoted in court by Dr. Hirsch:
[a] complete medical history should be obtained to determine conditions that might influence the selection of an IUD. A physical examination should include a pelvic examination, pap test, gonorrhea culture, and, if indicated, appropriate test for other forms of genital disease including genital actinomycosis, which usually can be detected by the pap test. The physician should determine that the patient is not pregnant.
Dr. Hirsch's notations show that Ms. Wright's pelvic examination was within normal limits. The culture revealed no growth. Dr. Hirsch did not perform a pap test. He noted that Ms. Wright had a two month old child, and at trial he independently recollected that Ms. Wright's lastmenstrual cycle immediately preceded insertion of the IUD, indicating that she was not pregnant.
Dr. Hirsch concluded that Ms. Wright's infection could not have been too great because severe PID creates sterility and Ms. Wright had become pregnant subsequent to having pelvic inflammatory disease. The record does not indicate whether Ms. Wright suffered with PID after the Charity hospitalization or after the insertion of the IUD.
The record provides a reasonable basis for the factual conclusion that the plaintiff failed to show negligence ipso facto based on the premise that plaintiff's prior history of severe PID was an absolute contraindication for insertion of an IUD in Ms. Wright's case.

INFORMED CONSENT
Ms. Wright contends that the jury erred in finding that the treatment rendered, that is, insertion of the IUD, did not require Dr. Hirsch to advise the plaintiff of the known risks associated with such procedure. Dr. Hirsch argues that informed consent was unnecessary. Qualifying his contention, Dr. Hirsch asserts that informed consent was not mandated insofar *787 as requiring that the physician inform the patient of the remote risk that the IUD could migrate out of the uterus and protrude out of her rectum.
The Louisiana Informed Consent Statute, LSA-R.S. 40:1299.40, provides:
Sec. 1299.40. Consent to medical treatment
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
C. Where consent to medical treatment from a patient, or from a person authorized by law to consent to medical treatment for such patient, is secured other than in accordance with Subsection A above, the explanation to the patient or to the person consenting for such patient shall include the matters set forth in Paragraph (a) of Subsection A above, and an opportunity shall be afforded for asking questions concerning the procedures to be performed which shall be answered in a satisfactory manner. Such consent shall be valid and effective and is subject to proof according to the rules of evidence in ordinary cases.
On appeal, plaintiff does not argue that written consent was required for insertion of an IUD but claims that the physician must present the patient with the patient brochure provided by the manufacturer and should inform the patient of the risks associated with an intrauterine device. The informed consent statute requires written consent in some procedures under Section A but also notes that other forms of consent shall be obtained subject to proof according to the rules of evidence in ordinary cases under Section C.
Valerie Wright testified that she and Dr. Hirsch never talked directly other than when he introduced himself as Dr. Hirsch. They did not discuss anything, and she did not ask any questions. Ms. Wright stated that the nurse told Dr. Hirsch that the patient was there for an IUD, and the nurse assisted in the procedure. According to Ms. Wright, Dr. Hirsch did tell her to come back in three or four months to have the IUD checked because sometimes IUD's cause infection. The plaintiff testified that Dr. Hirsch did not perform an examination but she could not see what he was doing. She did not sign a written consent form. Ms. Wright did not have any bleeding but felt cramping for a few days after she left the clinic.
The Medical Review Panel indicated that "the only issue of negligence is whether or not informed consent was obtained from the patient." Dr. Dwight McKenna, as a member of the Medical Review Panel, was of the opinion that insertion of an IUD is an invasive procedure requiring informed consent. He testified that the review panel was not presented with a written consent form. He stated, "[w]hether or not any other informed consent was given, because we do recognize oral informed consent as appropriate, we could not determine and that only a Jury could decide."
Dr. Sarah Lain testified that the physician should explain to the patient what the *788 IUD is and what the possible complications are. She noted that the IUD could cause infections which could lead to sterility. She opined that she would tell the patient that there might be a better method of contraception because of her history of PID.
In the record of Ms. Wright's visit to him on April 11, 1984, Dr. James E. Dobson noted plaintiff's statement that she had severe pain and bleeding for several days after insertion of the IUD but had no problems since then. In his notations, Dr. Dobson found that she had a normal pelvic examination but he did not observe a string for the IUD. Dr. Dobson testified that the patient should be given informed consent.
Dr. Simon Ward testified that he did not require written consent for insertion of an IUD. He noted that IUD insertion is a routine medical procedure not involving surgery.
Dr. Vincent A. Culotta testified that the patient should be told of material risks involved with the use of the intrauterine device.
In court, Dr. Hirsch testified that he had some independent recollection but not total recall of Ms. Wright. He vaguely remembered the plaintiff's only visit with him on October 25, 1983. He stated that the patient did not make any complaints at the time of insertion before she left the clinic. He told her to return in a week when the results of the culture would be back. Dr. Hirsch did not obtain a signed consent document from Ms. Wright but he agreed that he should describe various problems associated with the use of the intrauterine device and obtain informed consent before inserting an IUD.
Dr. Hirsch stated that it was his customary procedure to find out why the patient wanted a IUD. He would take the patient's history, perform an examination, and provide instructions at the same time. The doctor testified that he would discuss complications and risks with the patient, including the fact that she could become pregnant or that she could experience an increase in bleeding and cramping. He would tell the patient to feel for the IUD string because the IUD could go further into the body. Dr. Hirsch made notations on Ms. Wright's chart concerning her examination and history, indicating he obtained information from her.
The package insert provided by Searle Pharmaceuticals, Inc., the manufacturer of the CU-7 IUD, instructed in its procedures for insertion that the health provider should "describe the various problems associated with use of uterine device and obtain informed consent."
We disagree with Dr. Hirsch's assertion on appeal that informed consent was unnecessary because insertion of an IUD is a routine medical procedure which does not come within the purview of LSA-R.S. 40:1299.40. Informed consent is required under Section C of that statute although written consent may not be necessary. The physicians, including Dr. Hirsch, agreed that informed consent was necessary but they did not testify that written consent was required for the insertion of an IUD.
Dr. Hirsch contends that his duty to disclose material risks to the patient does not include the risk that the IUD could migrate out of the uterus and protrude out of the rectum.
The doctrine of consent to medical treatment is rooted in the idea that a person has a right to make major decisions regarding his own body. Karl J. Pizzalotto, M.D., Ltd. v. Wilson, 437 So.2d 859 (La.1983), on remand 444 So.2d 143 (La. App. 1st Cir.1983). In the absence of valid written consent, the patient claiming lack of informed consent must prove that a known risk of procedure was not disclosed, that the undisclosed risk actually occurred, and that a reasonable patient would have withheld his consent if advised of the specific risk. Seals v. Pittman, 499 So.2d 114 (La.App. 1st Cir.1986), writ denied, 503 So.2d 1021 (La.1987), certiorari denied, 484 U.S. 840, 108 S.Ct. 126, 98 L.Ed.2d 84 (1987). Disclosure by physicians of medical or surgical risks must be made only when a risk is of a magnitude that would be material in a reasonable patient's decision to *789 undergo treatment. Harris v. Bell, 543 So.2d 1137 (La.App. 1st Cir.1989). The duty of disclosure only applies to reasonably foreseeable material risks. LaCaze v. Collier, 434 So.2d 1039 (La.1983); Hondroulis v. Schumacher, 533 So.2d 1221 (La.1988) republished 553 So.2d 398.
The danger that an IUD might perforate the uterus is a known hazard of this method of contraception. McPheron v. Searle Laboratories, 888 F.2d 31 (5th Cir. (La.) 1989), certification granted, 559 So.2d 130 (La.1990), certif. question withdrawn, Op. vacated, 904 F.2d 251 (5th Cir. (La.) 1990). Searle's insert pamphlet includes the following warning:
5. Perforation. Partial or total perforation of the uterine wall or cervix may occur with the use of the CU-7, usually during insertions into patients sooner than two months after abortion or delivery, or in uterine cavities too small for the CU-7. An increased risk of perforation has been reported to occur when an IUD is inserted into lactating women compared to non-lactating parous women. The possibility of perforation must be kept in mind during insertion and at the time of any subsequent examination. If perforation occurs, laparotomy or laparoscopy should be performed as soon as medically feasible and the CU-7 removed. Abdominal adhesions, intestinal penetration, intestinal obstruction, and local inflammatory reaction with abscess formation and erosion of adjacent viscera may result if the CU-7 is left in the peritoneal cavity.
Dr. Sarah Lain opined that the IUD perforated the plaintiff's uterus at the time of insertion, and this was below the physician's medical standard of care. She agreed that, ranging from the most common to the least common, the risk included: infection; cramping; bleeding; expulsion through the vagina; pregnancy; a condition where the IUD remains imbedded in the uterine wall; and perforation was the rarest occurrence of about two percent. Dr. Lain affirmed that she had never experienced a perforation of a uterus with an IUD. In her opinion, the IUD perforated the uterine wall upon insertion because it came out down by the rectum and would have been higher if it came out as a result of pregnancy.
Dr. James Dobson stated that he felt that the IUD probably perforated the uterine wall upon insertion. He agreed that intrauterine devices can perforate, migrate, or move through the wall of the uterus into the pelvis even if properly inserted. Dr. Dobson also agreed that complications included infection, abnormal bleeding, irregular menstrual periods, pregnancy, and expulsion through the vagina. He responded that the risk of perforation or migration through the wall of the uterus and out of the rectum is quite rare. He affirmed that a fetus growing in a womb during pregnancy exerts a force on the interior walls of the uterus. Further, he agreed that there is a possibility that the intrauterine device migrated from the uterus to the abdominal cavity sometime during pregnancy.
Dr. Simon Ward related that the most common problems incurred in using an IUD include abnormal bleeding, pregnancy, and infection. He testified that he never saw a perforation of the uterus by an IUD and that it is really very rare. Dr. Ward opined that the IUD probably was pushed down into the wall of the uterus by the baby's head coming through when Ms. Wright delivered her baby. He later stated that he did not know whether the IUD got buried in the wall of the uterus at the time of delivery or at the time of insertion. He found that the IUD pushed through the common wall from the uterus to the rectal cavity.
Dr. Vincent Culotta noted that the most frequent risks of utilizing an IUD are pain, bleeding, and infection. He agreed that it is generally believed that perforations of the uterus occur at the time of insertion but he did not believe it was true in Ms. Wright's case.
In his opinion, Dr. Hirsch found that Ms. Wright's complication "is so rare that it is an anti-chance at most." He had never experienced a similar situation, that is, migration out of the rectum.
*790 The parties did not object to the wording of the Jury Interrogatories which the jury answered as follows:

INTERROGATORIES
1. Do you find that the plaintiff, Valerie Wright has proved by a preponderance of the evidence that Dr. Hirsch lacked the degree of knowledge or skill possessed by a physician, or that he failed to exercise the degree of care ordinarily exercised by a physician, who renders the type of treatment rendered to Valerie Wright?
 X 
 _______
 YES NO
2. Do you find that plaintiff, Valerie Wright has proved by a preponderance of the evidence that Dr. Hirsch failed to use reasonable care and diligence, along with his best judgment in the application of his skill in his treatment of Valerie Wright?
 X 
 _______
 Yes No
3. Do you find that Valerie Wright suffered injuries which were a proximate result of Dr. Hirsch's lack of knowledge or skill, or his failure to exercise the degree of care ordinarily exercised by a physician under the circumstances (that is the insertion of an IUD). [sic]
 X 
 _______
 Yes No
4. Do you find that the treatment rendered to Valerie Wright (that is the insertion of the IUD) required Dr. Hirsch to advise the plaintiff of the known risks associated with such procedure?
 X 
 _______
 Yes No
5. Do you find that the defendant Dr. Hirsch informed the plaintiff, Valerie Wright of the known, material risks associated with the procedure and that he gave her an opportunity to asking [sic] question [sic] concerning the procedure to be performed, and the [sic] he answered any questions in a satisfactory manner?
 _______ _______
 Yes No
6. Do you find that a resonable [sic] person in the plaintiffs' [sic] position would have concented [sic] to the procedure (that is the insertion of an IUD) it [sic] full disclosure had been made?
 _______ _______
 Yes No
7. What amount of damages, if any, expressed in a dollar amount do you find that Valerie Wright suffered as a result of Dr. Hirschs' [sic] lack of knowledge or skill, or as a result of his failure to exercise the degree of care ordinary [sic] exercised by physicians who render the type of treatment rendered to Valerie Wright or of failure to inform plaintiff of the known material risks of the treatment rendered to Valerie Wright?
$_______________
Plaintiff argues that the clear preponderance of the evidence demonstrates that informed consent is required and that the jury erred in answering negatively to Interrogatory Number 4.
We recognize that the evidence clearly shows that the physician had a duty to disclose known risks to the patient contrary to the jury's answer to Interrogatory Number 4. Despite the jurors' error, because we have the record before us and because a firsthand view of the witnesses is not essential to a resolution of the case, judicial economy dictates that we decide whether the trial court judgment should be upheld and whether the general verdict is consistent with the evidence presented at trial. LSA-C.C.P. Art. 1813. Ragas v. Argonaut Southwest Insurance Co., 388 So.2d 707 (La.1980); Daigle v. White, 544 So.2d 1260 (La.App. 4th Cir.1989).
After trial on the merits, the trial judge included in his instructions the following jury charges to which the parties did not object:
A doctor need not advise a patient about an easily corrected, remote or rare complication which would not be a determinative factor in the decision of an ordinary reasonable patient.

*791 The law holds that all known risks need not be disclosed because this may be impractical or unrealistic. However, under the statutes, a physician is required to advise a patient of any material consequences which would influence the decision of a reasonable person in the patient's condition ...
Disclosure must be made only when a risk is medically known and of a magnitude that would be material in a reasonable patient's decision to undergo treatment.
In light of these jury instructions, we conclude that the evidence clearly shows that the doctor's duty to obtain the plaintiff's informed consent in this case did not encompass the duty to disclose the remote possibility that the inserted IUD could perforate the uterus, migrate, and protrude from the rectum. That remote risk is not of such a magnitude that would influence the decision of a reasonable person in the plaintiff's condition. Dr. Hirsch did not have a duty to disclose to the plaintiff the risk that she incurred. We find that the general verdict is consistent with the evidence presented at trial and the jury verdict should be upheld.

DIRECTED VERDICT
Upon conclusion of the evidence at the close of plaintiff's case, New Orleans General Hospital presented a motion for directed verdict. Ms. Wright claims that the trial court erred in granting the motion. Plaintiff contends that the evidence established that the hospital was negligent for referring her to Dr. Hirsch and representing that he was skilled in inserting intrauterine devices.
Plaintiff argues that Dr. Lain testified that the hospital was at fault for referring the patient to Dr. Hirsch. In Dr. Lain's opinion, Dr. Hirsch was not qualified to insert IUD's and referral to him was below the required medical standard of care. Dr. Lain based her conclusion on the assumption that the plaintiff had called the hospital and was directly referred to Dr. Hirsch. However, the plaintiff testified that she went to New Orleans General Hospital where she asked where she could see about IUD's, and they told her to go to the third floor. Plaintiff stated that she previously had been to the Sub-specialty Clinic. Additional testimony established that the Sub-specialty Clinic was a separate entity from the hospital.
A motion for directed verdict should be granted only if the facts and inferences are so overwhelmingly in favor of the moving party that the court believes that reasonable men could not arrive at a contrary verdict. LSA-C.C.P. art. 1810; O'Dowd v. Correa, 464 So.2d 885 (La App. 4th Cir. 1985); Poirrier v. Trailmobile, 550 So.2d 1349 (La.App. 4th Cir.1989). After reviewing the evidence, we agree with the trial judge that the plaintiff cannot possibly prevail against New Orleans General Hospital. The record contains no evidence that the hospital referred the plaintiff to Dr. Hirsch or that the hospital made any representations about Dr. Hirsch's qualifications. No evidence adduced at trial indicated that the hospital was negligent. The trial court properly concluded that the plaintiff's evidence, viewed with all reasonable inferences most favorable to the plaintiff, was such that a reasonable man could not arrive at a contrary conclusion.

MATERIAL WITNESS
During the course of the trial, plaintiff discovered the identity of Alodia Johnson, the nurse who assisted Dr. Hirsch in inserting the IUD. At the close of plaintiff's case, the trial court ruled in Chambers that the plaintiff could not call a new witness. Plaintiff contends that a new trial must be granted because Ms. Johnson's testimony provided new evidence that Dr. Hirsch did not obtain informed consent from the plaintiff and that the patient suffered an abnormal amount of pain during insertion of the IUD. Plaintiff claims that granting a new trial is peremptory in this case.
To obtain a new trial pursuant to LSA-C.C.P. art. 1972(2), the moving party must show that the new evidence was not cumulative, would tend to change the result of the case, and could not have been *792 discovered before or during trial with due diligence. Barker v. Rust Engineering Co., 428 So.2d 391 (La.1983); Jordan v. Hubbard, 541 So.2d 211 (La.App. 4th Cir. 1989), writ not considered, 543 So.2d 13 (La.1989).
The record indicates that in its answer to plaintiff's interrogatories, New Orleans General Hospital stated that, "[d]efendant is unaware of any direct witness to plaintiff's incident." If the nurse were employed by the Sub-specialty Clinic rather than the hospital, New Orleans General Hospital would not have a record of Ms. Johnson's employment. On appeal, Dr. Hirsch provides a portion of the plaintiff's deposition taken on January 30, 1986, in which Ms. Wright stated that she knew the nurse who was still at the hospital as the head nurse on the floor. Plaintiff had sufficient information to conduct additional discovery, including a request for production of work schedules and personnel records of the Sub-specialty Clinic as well as the hospital. Plaintiff could have gone to the clinic and hospital and could have located the nurse because plaintiff recognized and knew where the nurse worked at the time of the deposition.
We find that because plaintiff failed to use due diligence in the discovery process and failed to timely procure the evidence, granting a new trial in this case is not peremptory. The trial court properly exercised its discretion to deny plaintiff's motion to present new evidence in reopening her case after plaintiff had rested in light of the fact that the plaintiff knew or should have known of the available evidence well in advance of trial. See LeBlanc v. Consolidated Aluminum Co., 401 So.2d 1082 (La.App. 3rd Cir.1981), writ denied, 409 So.2d 617 (La.1981).
For the foregoing reasons, we find no abuse of the trial court's discretion in its rulings or manifest error in the jury's verdict in favor of Dr. Hirsch. Accordingly, we render judgment consistent with the general verdict of the jury and affirm the dismissal of plaintiff's action.
AFFIRMED.
BARRY, J., dissents with written reasons.
BARRY, Judge, dissenting.
I agree with the majority that the jury erred by deciding that insertion of an IUD is a procedure for which informed consent is not required. La.R.S. 40:1299.40(C). The facts and medical testimony fail to prove that this plaintiff gave informed consent.
In Hondroulis v. Schumacher, 553 So.2d 398 (La.1989) (on rehearing), the Supreme Court discussed the nature of informed consent in detail:
The informed consent doctrine is based on the principle that every human being of adult years and sound mind has a right to determine what shall be done to his or her own body.... Surgeons and other doctors are thus required to provide their patients with sufficient information to permit the patient himself to make an informed and intelligent decision on whether to submit to a proposed course of treatment.... Where circumstances permit, the patient should be told the nature of the pertinent ailment or condition, the general nature of the proposed treatment or procedure, the risks involved in the proposed treatment or procedure, the prospects of success, the risks of failing to undergo any treatment or procedure at all, and the risks of any alternate methods of treatment. (citations omitted). Hondroulis at 411.
In order to obtain informed consent a doctor is required to disclose all "material" risks. A risk is material if a reasonable person in what the doctor knows or should know to be the patient's position would consider the risk or cluster of risks significant in deciding whether to undergo a medical procedure. Hondroulis, at 411-412.
Although Dr. Hirsch may not have had a duty to inform Ms. Wright of the possibility that the IUD could migrate from her uterus to her rectum, the doctor had a duty to inform her of any risk that a reasonable person in her position would consider significant.
*793 Ms. Wright had a history of pelvic inflammatory disease. She delivered a child two months prior to insertion of the IUD. Due to that history the IUD posed a greater than normal hazard, including a higher than average risk of infection and/or perforation of the uterus. Because insertion of an IUD is an elective procedure and alternative methods of contraception were available, Ms. Wright should have been informed of any risk due to her medical history.
At best, Dr. Hirsch gave Ms. Wright general information about an IUD. His testimony confirms that he did not talk to Ms. Wright about her suitability for an IUD or discuss birth control alternatives.
The medical testimony convinces me that Dr. Hirsch failed to advise Ms. Wright of serious risks, and thus, he did not obtain informed consent from Ms. Wright as required by R.S. 40:1299.40(C).