641 So.2d 677 (1994)
Woodrow GRAHAM, William Graham, J. Van Graham, Eric Graham, Larry Graham, Jack Michael Graham, Nancy Jones, Nellie Jones and Jerry Mooney
v.
Dr. Robert F. RYAN, Tulane University School of Medicine and Tulane Medical School.
No. 93-CA-2155.
Court of Appeal of Louisiana, Fourth Circuit.
July 27, 1994.
Rehearing Denied September 13, 1994.
Michael C. Palmintier, deGravelles, Palmintier & Holthaus, Baton Rouge, and Daniel C. Palmintier, Lafayette, for plaintiffs.
Stewart E. Niles, Jr., Michelle A. Bourque, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendants.
Before SCHOTT, C.J., and CIACCIO and ARMSTRONG, JJ.,
ARMSTRONG, Judge.
This is a medical malpractice case. Specifically, plaintiffs-appellants allege that the defendants-appellees did not obtain the informed consent of a patient for surgery and that, as a result of that surgery, the patient died. The trial court found that the plaintiffs, who are the adult children of the patient, had failed to rebut a presumption of informed consent which is applicable under the Uniform Consent Law, La.R.S. 40:1299.40, and directed a verdict for the defendants. We affirm.
"A motion for directed verdict is properly granted whenever, considering the evidence in the light most favorable to the non-moving party, the facts and inferences are so overwhelmingly in favor of the mover *678 that the court believes that reasonable persons could not arrive at a contrary verdict." Poirrier v. Trail-mobile, Inc., 550 So.2d 1349, 1350 (La.App. 4th Cir.1989), writ denied, 556 So.2d 58 (La.1990). Accord, e.g., Palermo v. NME Hospitals, Inc., 558 So.2d 1342 (La. App. 4th Cir.1990) (medical malpractice case). Thus, we must examine the evidence in this case to determine whether, in light of the applicable law, a reasonable jury could have held for the plaintiffs.
Mrs. Lola Thomas suffered from a tumor in her jaw in 1969. The tumor was removed by surgery, but that also required removal of a portion of her jaw bone. This left an indentation in the side of her face. In 1972, she entered a hospital to have plastic surgery to restore her jaw. This involved taking a piece of one of her ribs and placing it in her jaw. Mrs. Thomas became concerned about the risks of that surgery, particularly the risk of death from that surgery, and she left the hospital without the surgery ever having been done. Thus, Mrs. Thomas had actual knowledge of the risk of death from this type of surgery.
However, in 1982, Mrs. Thomas decided to have the surgery done to restore her jaw. After an initial visit with Dr. Ryan, who is one of the defendant-appellees, she was admitted to the Tulane Medical Center, which is the other defendant-appellee, for pre-surgical evaluation and surgery. Mrs. Thomas was admitted to the hospital on October 3, 1982, and the surgery was performed on October 6, 1982. Mrs. Thomas was admitted to the hospital three days before the surgery so that various consultations, work-ups, tests and examinations could be done by specialists in order to "clear" Mrs. Thomas for the surgery. Mrs. Thomas had a number of health problems, including diabetes, asthma and high blood pressure, but it was determined that all of them were under control with medication or otherwise and that Mrs. Thomas was fit for surgery. However, some time after the surgery, Mrs. Thomas developed complications and eventually died about ten days after surgery from blood clots in her heart.
Plaintiffs-appellants do not challenge or appeal either the determination that Mrs. Thomas was fit for surgery, the performance of the surgery itself or the post-surgical care of Mrs. Thomas. Instead, all they complain of is an alleged failure to properly inform Mrs. Thomas of the risks of surgery prior to obtaining her consent to the surgeryi.e. the plaintiffs complain that Mrs. Thomas' consent was not informed consent.
This case is governed by the Uniform Consent law, which has been enacted in Louisiana, and which states, in pertinent part:
A. Notwithstanding any other law to the contrary, written consent to medical treatment means a consent in writing to any medical or surgical procedure or course of procedures which (a) sets forth in general terms the nature and purpose of the procedure or procedures, together with the known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss or loss of function of any organ or limb, of disfiguring scars associated with such procedure or procedures, (b) acknowledges that such disclosure of information has been made and that all questions asked about the procedure or procedures have been answered in a satisfactory manner, and (c) is signed by the patient for whom the procedure is to be performed, or if the patient for any reason lacks legal capacity to consent by a person who has legal authority to consent on behalf of such patient in such circumstances. Such consent shall be presumed to be valid and effective, in the absence of proof that execution of the consent was induced by misrepresentation of material facts.
B. Except as provided in Subsection A of this Section, no evidence shall be admissible to modify or limit the authorization for performance of the procedure or procedures set forth in such written consent.
La.R.S. 40:1299.40(A) and (B). Thus, when the hospital uses a written surgical consent that complies with the Uniform Consent law, a rebuttable presumption of informed consent arises. Hondroulis v. Schumacher, 553 So.2d 398 (La.1988).
Although the interpretation of La.R.S. 40:1299.40 is problematic because of the statute's lack of clarity and precision, we *679 conclude that the legislative aim was to establish a rebuttable, rather than a conclusive, presumption of consent to encounter risks adequately described in the consent form, subject to the patient's right to overcome the presumption by showing that consent was induced by misrepresentation. In our opinion, under the statute, (1) if it is proved that the patient signed a document purporting to warn him of a risk involved in the proposed surgery or treatment, (2) it is presumed that the patient understood and consented to encounter whatever risk a reasonable person, in what the doctor knew or should have known to be the patient's position, would have apprehended from the written consent form, and (3) the patient cannot disprove the presumed fact except by showing that his consent was induced by misrepresentation.
Hondroulis, 553 So.2d at 417.
In our recent decision, Kennedy v. St. Charles General Hospital Auxiliary, 630 So.2d 888 (La.App. 4th Cir.1993), writ denied, 634 So.2d 863 (La.1994), the plaintiff suffered a stroke after, and as a result of, undergoing a three vessel angiogram. The plaintiff complained that he had not been given sufficient information as to the risks of the procedure and therefore, his consent to the procedure was not informed consent. We rejected the plaintiff's contention because the plaintiff had signed a written consent which complied with the Uniform Consent Law and because "the record contain[ed] no information to rebut the presumption that a valid informed consent was obtained". 630 So.2d at 894. We also held:
The plaintiff signed a consent form which indicated that he had been told of the risks of brain damage, paralysis, death, and loss or loss of function of an arm or leg. Absent a showing that this signed consent was induced by a misrepresentation, a rebuttable presumption exists that informed consent was obtained. No testimony was introduced to show that the plaintiff's consent was induced by misrepresentation. The plaintiff was not present to testify on the day of trial [due to an illness unrelated to the procedure at issue]
630 So.2d at 894. As will be discussed immediately below, the present case is similar in important respects to the Kennedy case.
In the present case, Mrs. Thomas executed a written surgical consent which complies with the Uniform Consent law and specifically warns of the possibility of death from the jaw restoration surgery. Among other things, that surgical consent form states:
The procedure has been explained to me. Alternate methods have also been explained to me, as have the advantages and disadvantages. I am advised that though good results are expected, the possibility and nature of complications cannot be anticipated and that, therefore, there can be no guarantee expressed or implied as to the result of surgery or as to cure. The possible risks include death[.]
* * * * * *
I hereby state I have read and understand this consent, all questions about the procedure or procedures have been answered in a satisfactory manner[.]
Also, the written surgical consent is signed by Dr. Ryan. Thus, it must be presumed that Mrs. Thomas gave informed consent for the surgery in this case.
Several of the plaintiffs-appellants attempted to rebut the presumption of informed consent by testifying that, when they were visiting their mother, Mrs. Thomas, in the hospital prior to the surgery, they did not hear Dr. Ryan explain to her any risks of the surgery. However, while it is undisputed that three of the children, William Graham, Jerry Graham Mooney and Nancy Graham Jones, visited Mrs. Thomas at the hospital prior to her surgery, it also is undisputed that William Graham was there only on the evening of October 3, 1982, and Jerry Graham Mooney and Nancy Graham Jones admitted that they were not with their mother in the hospital at times prior to the surgery while their mother was undergoing examinations, consultations, etc., with the doctors. All three children readily admitted they were not with their mother when she executed the written surgical consent. For example, Nancy Graham Jones testified:

*680 Q: And over time things kind of blend together in terms of what you remember versus what somebody told you versus what really went on, correct?
A: Right.
Q: Thank you. In all fairness, Ms. Jones, you can't say that Dr. Ryan never warned your mother about any risk or all the risks
A: No.
Q: because you really don't know one way or the other?
A: Right.
The plaintiffs did not call Dr. Ryan or any hospital employees to ask about their discussions with Mrs. Thomas. Lastly, a medical review panel examined the record, a deposition of Dr. Ryan and submissions by both the plaintiffs and the defendants and a member of the panel testified that the process of obtaining Mrs. Thomas' informed consent was proper. Plaintiffs-appellants presented no expert medical testimony to the contrary.
As in the Kennedy case, there is simply no evidence in the record "to rebut the presumption [arising from the written consent] that a valid informed consent was obtained". Kennedy, 630 So.2d at 894. Also, as in the Kennedy case, the only expert medical testimony in the present case on the informed consent issue is that a proper informed consent was obtained. Id. Based on this record, and considering the presumption of a valid consent created by the written consent and the Uniform Consent Law, a reasonable jury could not have found in favor of the plaintiffs.
The trial court did not err in granting a directed verdict in favor of the defendants. Therefore, the judgment of the trial court is affirmed.
AFFIRMED.
SCHOTT, C.J., concurs.
SCHOTT, Chief Judge, concurring:
Plaintiffs argue that their evidence established that Dr. Ryan misrepresented the severity of their mother's operation by characterizing it as "a simple procedure" and that she would be home three or four days after it was performed.
This evidence consisted of the testimony of decedent's son that he heard Dr. Ryan make these statements to his mother on October 3 when she was admitted to the hospital for the surgery, and the testimony of her two daughters that they heard Ryan make these statements to their mother in his office a couple of days prior to her admission on October 3. Since this testimony was uncontradicted I accept it as true. The question is whether this constitutes "proof that execution of the consent was induced by misrepresentation of material facts" as required by R.S. 40:1299.40(A) to overcome the presumption that the consent was valid.
The consent form was signed on October 6 just before the surgery. None of the plaintiffs was present at this time. As pointed out in the opinion of my colleagues the consent form specifically acknowledged the possibility of complications including the risk of death. Dr. Ryan's loose statements made several days before the consent was executed and probably designed to assuage the patient's natural apprehension over the contemplated surgery could not be considered by reasonable persons as material misrepresentations about the risks of the surgery. Furthermore, since these statements were not made at the time of the execution of the consent and there is no evidence that they were repeated or recalled by Dr. Ryan in order to induce her execution of the consent, the statements were insufficient as a matter of law to rebut the presumption of the validity of the consent.