665 So.2d 1206 (1995)
Margaret Brignac HARTMAN
v.
Dr. Robert D'AMBROSIA.
No. 95-CA-0393.
Court of Appeal of Louisiana, Fourth Circuit.
November 30, 1995.
Michele Gaudin, Gaudin and Longoria, New Orleans, for Plaintiff.
Richard P. Ieyoub, Attorney General, Irving H. Koch, Special Assistant Attorney General, Koch & Koch, New Orleans, for Defendant.
Before LOBRANO, ARMSTRONG and WALTZER, JJ.
*1207 ARMSTRONG, Judge.
This is a medical informed consent case. The defendant, Dr. Robert D. D'Ambrosia, performed foot surgery on the plaintiff, Mrs. Margaret Brignac Hartman. Mrs. Hartman sued Dr. D'Ambrosia because, she alleges, he did not properly inform her of the risks of the surgery prior to obtaining her consent for the surgery. Thus, she alleges that she did not give informed consent for the surgery. The trial court agreed with Mrs. Hartman, found in her favor as to liability, and fixed damages at $25,000.00. Dr. D'Ambrosia appeals as to liability. There is no appeal as to quantum of damages. We affirm.
Mrs. Hartman went to see Dr. D'Ambrosia because she had a bunion on the great toe of her right foot. She had been to see another doctor previously but went to see Dr. D'Ambrosia on the recommendation of a friend who also was a friend of Dr. D'Ambrosia. There was some sort of mix up as to Mrs. Hartman's appointment time and she arrived just as Dr. D'Ambrosia was supposed to leave for a meeting. This circumstance seems to have caused the appointment to be quite brief, as little as fifteen minutes, and the time spent included some purely social conversation. This would have left little time for Dr. D'Ambrosia to give much explanation of the risks of the surgery. Also, this brief appointment was the only time Mrs. Hartman was seen by Dr. D'Ambrosia until the surgery.
The conversation that took place during the single pre-surgery office visit is important and was hotly contested at trial. Both Mrs. Hartman and Dr. D'Ambrosia, the only witnesses as to the conversation, do agree that he explained the essentials of what the surgery would entail. Dr. D'Ambrosia told her that he would remove the bunion from Mrs. Hartman's great toe of her right foot. He also diagnosed a "hammer toe" of the second toe of the right foot and told her he would perform a procedure on that toe to correct that condition. Additionally, he diagnosed a problem with a metatarsal, a bone of the foot, in her right foot but told her he would not do any procedure specifically as to that.
With respect to what Dr. D'Ambrosia told Mrs. Hartman as to the expected results of the surgery, Mrs. Hartman and Dr. D'Ambrosia sharply disagreed. Mrs. Hartman testified that Dr. D'Ambrosia told her that she would have to wear a cast for about six weeks after the surgery and use a soft canvas shoe for about six months after the surgery, but that she would be able to wear high heels at about a year after the surgery. Great controversy centers around the alleged statement that Mrs. Hartman would be able to wear high heels. Dr. D'Ambrosia emphatically denies making any such statement. It is also a fairly obvious inference from Mrs. Hartman's testimony that she came away from the appointment with Dr. D'Ambrosia with the impression that after the surgery she would have a normal right foot. She acknowledges that Dr. D'Ambrosia said that he would not operate on the metatarsal but, as she understood it, that was because the surgery on the great toe and the second toe would help with the metatarsal pain and that Dr. D'Ambrosia believed that the metatarsal was "not a problem." Dr. D'Ambrosia's testimony generally was contradictory to Mrs. Hartman's testimony and he took the view at trial that Mrs. Hartman had "unrealistic expectations" of having a normal right foot.
On the specific topic of high heels, Mrs. Hartman testified that, after a divorce, she moved to the French Quarter and bought high heels. The high heels precipitated, or at least aggravated, a bunion problem. She testified that the reason for going to see a doctor about the bunion problem was, in addition to relief from pain, to be able to wear high heels. She had friends who had bunions and, after surgical treatment, they had worn high heels. Mrs. Hartman is described in testimony as dressing in a "stylish" or "fashionable" manner and, because she is five feet two inches tall, high heels are important her. In short, from Mrs. Hartman's perspective, the question of wearing high heels was of great significance to her decision to go ahead with the surgery.
Dr. D'Ambrosia performed the surgery on Mrs. Hartman as he had described it to her. It appears that Mrs. Hartman's recovery *1208 from the surgery was slow, painful and perhaps complicated. On the other hand, Mrs. Hartman does not allege that Dr. D'Ambrosia performed the surgery incorrectly or that there was any malpractice in the actual treatment she received. Further, Dr. D'Ambrosia testified to the effect that the eventual results of the surgery were as he expected and that, from his point of view, the surgery was a success.
However, from Mrs. Hartman's point of view, the results of the surgery were a great disappointment. For some time after the surgery she was seen by other doctors, not Dr. D'Ambrosia, because he was out of the country for an extended vacation. When Mrs. Hartman eventually did see Dr. D'Ambrosia, he told her that she could not wear high heels in the future and that she should have an orthotic insert, a sort of plastic foot support, made and should wear it inside her shoe so as to relieve the pain she was continuing to have from her metatarsal. Mrs. Hartman testified that she was "stunned" by this advice from Dr. D'Ambrosia because it was directly contrary to what he had told her before the surgery as to the high heels and because he had never said anything about orthotic inserts prior to the surgery. Mrs. Hartman testified that Dr. D'Ambrosia "backtracked" and "reversed himself" relative to his pre-surgery advice.
Mrs. Hartman did try the orthotic insert, albeit in a perfunctory fashion for an hour at a time, but she received no relief from the pain in her foot which pain, Dr. D'Ambrosia testified, originated with the metatarsal. In any case, she argues, Dr. D'Ambrosia never told her before the surgery that such an orthotic insert would be necessary and she testified that she found the orthotic insert objectionable because it "meant cripple." Her testimony that nothing was said by Dr. D'Ambrosia about the orthotic insert before the surgery is unrebutted. Instead, Dr. D'Ambrosia testified (consistently with Mrs. Hartman), that he simply told Mrs. Hartman that he would not be operating on the metatarsal.[1]
There are two factual issues as to the single pre-surgery visit of Mrs. Hartman to Dr. D'Ambrosia. First, whether it was reasonable for Mrs. Hartman to conclude, based upon her conversation with Dr. D'Ambrosia, that she would be able to wear high heels a year after the surgery. Second, whether it was reasonable for Mrs. Hartman to conclude, based upon her conversation with Dr. D'Ambrosia, that she could expect her foot to be normal. This latter question, as to a "normal foot" really seems to be based on an underlying question of whether Mrs. Hartman, based upon her conversation with Dr. D'Ambrosia, reasonably should have expected the pain which originated in her metatarsal to be relieved by the surgery. The trial court resolved both of these factual issues in Mrs. Hartman's favor. We may not disturb those factual findings unless they are "manifestly erroneous" or "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989); Stobart v. State, DOTD, 617 So.2d 880 (La.1993). Both factual issues turn largely on the relative credibility of Mrs. Hartman and Dr. D'Ambrosia and such questions of credibility are largely the task of the trial court. Id. We cannot say that the trial court was clearly wrong or manifestly erroneous in resolving these factual issues in favor of Mrs. Hartman.
In addition to her single pre-surgery conversation with Dr. D'Ambrosia, when Mrs. Hartman was admitted to the hospital for surgery, a resident, Dr. Hernandez, took a medical history from her and gave her some explanation of the surgery. At trial, Dr. Hernandez did not actually recall his conversation with Mrs. Hartman, but, based upon his usual practice, it would have included some explanation that there are risks associated with surgery. However, his testimony did not indicate that he would have discussed high heels with Mrs. Hartman or that he would have addressed the specifics of the expectations for the surgery that had been the subject of the pre-surgery conversation between Mrs. Hartman and Dr. D'Ambrosia. *1209 The trial court evidently concluded that this general conversation between Dr. Hernandez and Mrs. Hartman, which Dr. Hernandez did not actually recall, would not have negated the impressions Mrs. Hartman had obtained from her earlier conversation with Dr. D'Ambrosia. We cannot conclude that the trial court was clearly wrong or manifestly erroneous in this regard either.
After she was admitted to the hospital for surgery, Mrs. Hartman signed a surgical consent form. This was a standard consent form in compliance with the medical informed consent statute La.R.S. 40:1299.40. The form said, among other things, that no guarantee was given as to the result of the surgery. Of course, the form said nothing about high heels. Also, the form did not say anything about the expectation of a "normal foot." In fact, the form did not say anything specific about the expected results of the surgery.
The Supreme Court has ruled as to the effect, under La.R.S. 40:1299.40, of a patient's signing a consent form such as that in the present case:
Although the interpretation of La.R.S. 40:1299.40 is problematic because of the statute's lack of clarity and precision, we conclude that the legislative aim was to establish a rebuttable, rather than a conclusive, presumption of consent to encounter risks adequately described in the consent form, subject to the patient's right to overcome the presumption by showing that consent was induced by misrepresentation. In our opinion, under the statute, (1) if it is proved that the patient signed a document purporting to warn him of a risk involved in the proposed surgery or treatment, (2) it is presumed that the patient understood and consented to encounter whatever risk a reasonable person, in what the doctor knew or should have known to be the patient's position, would have apprehended from the written consent form, and (3) the patient cannot disprove the presumed fact except by showing that his consent was induced by misrepresentation.
Hondroulis v. Schuhmacher, 553 So.2d 398, 417 (La.1988). Accord Graham v. Ryan, No. 93-CA-2155, 641 So.2d 677 (La.App. 4th Cir. 1994) (quoting Hondroulis), writ denied, 94-2538, 648 So.2d 403 (La. Dec. 19, 1994).[2]
The present case has a somewhat different factual context than the Hondroulis and Graham cases because, in each of those cases, the risk involved was a complication that was caused by the surgery. In Hondroulis the risk that materialized was loss of bladder control and in Graham the risk that materialized was death. In Hondroulis, it was determined that the consent form would not inform a reasonable person of the risk that materialized and in Graham it was determined that the form would inform a reasonable person of the risk that materialized.
In contrast, the present case does not involve a condition caused by the surgery. Instead, the complaint in the present case is that the undesirable condition (inability to wear high heels and an abnormal/painful foot) continued despite the surgery. Thus, the "risk" involved in the present case is that Mrs. Hartman's objectives for the surgery, wearing high heels and having a normal foot, would not be met by the surgery.
Dr. D'Ambrosia points out that the informed consent form signed by Mrs. Hartman stated that the results of the surgery were not guaranteed. Mrs. Hartman concedes that Dr. D'Ambrosia did not tell her that the results of the surgery were guaranteed. However, something more extreme than just a risk of an unsuccessful result is involved in the present case. Dr. D'Ambrosia testified to the effect that he did not have any expectation that, even if the surgery were completely successful, Mrs. Hartman would be able to wear high heels or would have a normal foot. Thus, even if the surgery was completely successful, and, apparently, it was eventually, there was no chance that Mrs. Hartman would be able to wear high heels or have a normal foot. Nothing in the consent form indicates that Mrs. Hartman's *1210 objectives as to the surgery definitely would not be accomplished.
Our decision in Givens v. Cracco, 607 So.2d 727 (La.App. 4th Cir.1992), is fairly analogous to the present case. In Givens, the plaintiff patient had a series of back operations which, he hoped, would relieve his back pain. The operations did not relieve the pain. There was testimony that the defendant doctor had not guaranteed the results of the operations and it was undisputed that the patient had signed a consent form like that in Hondroulis and the present case. Medical testimony established that the operations were very unlikely to relieve the patient's pain. It was held that, despite the lack of a guarantee of the result, and despite the plaintiff's signing the consent form, there was a lack of informed consent because the doctor did not inform the patient that the surgery was very unlikely to accomplish the patient's objective of pain relief. Similarly, in the present case, the fact that there was no guarantee of the result of the surgery, and the fact that the consent form was signed, does not alter the fact that the patient was not informed that the surgery definitely would not accomplish the patient's objective in having the surgery.
Dr. D'Ambrosia argues that, even if fully informed of the "risks" of the surgery (i.e., the facts that the surgery definitely would not make it possible for Mrs. Hartman to wear high heels and definitely would not result in a normal foot), a reasonable person in the position of Mrs. Hartman would have consented to the surgery anyway. Mrs. Hartman testified that, had she been informed of the "risks" of the surgery, she would not have consented to the surgery. However, Mrs. Hartman's testimony is not sufficient to decide the issue because an objective "reasonable person" standard is used to determine whether the patient reasonably would have refused to consent to the surgery if informed of the risks.
There must be a causal relationship between the doctor's failure to disclose material information and material risk of damage to the patient.... Because of the likelihood of a patient's bias in testifying in hindsight on this hypothetical matter, this court and others have adopted an objective standard of causation: whether a reasonable patient in the plaintiff's position would have consented to the treatment or procedure had the material information and risks been disclosed.
Hondroulis, 553 So.2d at 412 (citations omitted). Accord Roussel v. Sharp, 569 So.2d 67, 72-73 (La.App. 4th Cir.1990).
In some cases, the risk might be so slight, and the need for the surgery so great, that no reasonable person would refuse the surgery. In those cases, the failure to inform the patient of the risk cannot be said to have caused any harm even if the risk materializes. In other cases the risk might be somewhat greater and/or the need for the surgery somewhat lesser and so reasonable patients could differ as to whether to proceed with the surgery. In such cases in which reasonable patients might differ, the failure to inform the patient of the risks is significant and can be said to have caused harm if the risk materializes. See Givens v. Cracco, 607 So.2d 727, 732 (La.App. 4th Cir.1992) ("A reasonable person, having been advised of these risks, may very well have decided to forego the surgeries that Dr. Cracco performed on the appellee.").
In the present case, the trial court found that a reasonable patient in the position of Mrs. Hartman could have refused the surgery. There was some testimony by Dr. D'Ambrosia that he believed the surgery was necessary to relieve pain in Mrs. Hartman's foot. There also was some other medical testimony that the surgery would be recommended to prevent possible further deterioration in the health of Mrs. Hartman's foot. But, there was no evidence that Mrs. Hartman's condition was life-threatening or that any need for surgery was extremely urgent. Moreover, Mrs. Hartman testified that she has the identical bunion and "hammer toe" problems with her left foot as with her right foot, she has never had surgery on her left foot, she has no plans for surgery on her left foot and that she has "lived with" the bunion and "hammer toe" on her left foot. We cannot say that the trial court was clearly wrong or manifestly erroneous in finding that *1211 a reasonable patient in Mrs. Hartman's position might have refused the surgery.[3]
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
NOTES
[1] Later, Mrs. Hartman had a second operation, in an attempt to remedy the metatarsal problem, and a third operation was later recommended but not performed. Although there was considerable discussion at trial about this second operation, and the recovery from it, the present appeal concerns only informed consent for the first operation.
[2] See also Kennedy v. St. Charles General Hospital Auxiliary, 630 So.2d 888, 891-94 (La.App. 4th Cir.1993); Roussel v. Sharp, 569 So.2d 67, 72-73 (La.App. 4th Cir.1990); Wright v. Hirsch, 572 So.2d 783, 788-91 (La.App. 4th Cir.1990).
[3] Dr. D'Ambrosia complains that the trial court put the burden on him, rather than on Mrs. Hartman, as to the issue of whether a reasonable patient might have refused the surgery. We do not think this is the case as the trial court specifically cited the Hondroulis decision. In any case, in this bench trial, where there was some evidence on both sides of the issue, it is apparent that the exact allocation of the burden of proof was not dispositive of this case.