637 So.2d 1290 (1994)
Emily SNIA
v.
UNITED MEDICAL CENTER OF NEW ORLEANS and John S. Sardisco, M.D.
No. 93-CA-2367.
Court of Appeal of Louisiana, Fourth Circuit.
May 26, 1994.
*1291 Joseph W. Thomas, New Orleans, for Emily Snia.
Gregory C. Weiss, Lastrapes & Weiss, New Orleans, for United Medical Center of New Orleans and Dr. John S. Sardisco.
Before KLEES, WARD and PLOTKIN, JJ.
WARD, Judge.
This action arose out of the death of Mrs. Mamie Wallace. Mrs. Wallace's daughter, Emily Snia, sued Dr. John S. Sardisco and other health care providers, contending that Dr. Sardisco's treatment of Mrs. Wallace fell below the standard of care ordinarily practiced by emergency room physicians. Ms. Snia claims that Dr. Sardisco's negligence and failure to follow proper emergency room protocol deprived her mother of a chance of survival.
The jury found that Dr. Sardisco lacked the requisite knowledge or skill of an emergency room physician but that this deficiency did not cause Mrs. Wallace's death.
Ms. Snia appeals the dismissal of her suit arguing that the trial court committed reversible error by its failure to instruct the jury on the theory of loss of a chance of survival.
There is merit in plaintiff's argument. The record indicates that Ms. Snia requested such a charge but the trial court refused. This was error. The allegations of Ms. Snia's petition and amended petition coupled with her presentation of expert testimony plus arguments to the jury clearly express a claim of "loss of chance".
In a jury trial, the judge is not required to give the precise instructions submitted by either party, but he must give instructions which properly reflect the law applicable in light of the pleadings and facts in each particular case. If instructions concerning negligence and liability are confusing or misleading, or omit an applicable essential legal principle, such instructions constitute reversible error. Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975). Nevertheless, when an appellate court has all the facts before it, a trial judge's erroneous instruction to the jury does not warrant a remand; rather, the appellate court should review the facts and law and render a decision. Gonzales, supra. Having concluded Ms. Snia suffered prejudicial error, and guided by the foregoing precepts, we vacate the jury's findings, review the matter as the trier of fact and render judgment.
The facts of this case show that on November 11, 1989, Mrs. Mamie Wallace, an 82-year old woman with a history of asthma and diabetes, arrived at United Medical Center with complaints of shortness of breath. In route to the hospital, ambulance personnel administered Bumex and Proventil, on the suspicion she was either in congestive heart failure or was having an asthma attack. She arrived at the emergency room at approximately 11:25 p.m. and at 11:30 p.m. was given.3 cc. of Terbutaline subcutaneously and nasal oxygen by catheter at a rate of 3 liters per minute. Five minutes later, staff administered 125 mg. of Solumedrol by intravenous injection and drew a blood theophylline level. All of her vital signs were normal except her respiratory rate of 32. Her EKG was considered normal, but did indicate L ventricular hypertrophy which was consistent with asthma. The EKG showed no signs of ischemic changes, no ST elevation and no ST depression. Her chest x-ray was normal, demonstrating no infiltrates or effusion. She had swelling in her feet.
Dr. John Sardisco was the attending emergency room physician who performed the initial physical examination of Mrs. Wallace. From listening to her heart, he charted that he found no rales, murmurs, gallops or evidence of heart problems and noted the patient "denies chest pain". By 11:40 p.m. Mrs. Wallace told Dr. Sardisco that she felt better. Dr. Sardisco decided to hold Mrs. Wallace in the emergency room for observation. At this time, Mrs. Wallace was sitting *1292 in bed talking to her daughter and breathing without difficulty when suddenly, she complained of shortness of breath. A code blue was called and resuscitative efforts were begun. The efforts failed; Mrs. Wallace was pronounced dead at 12:44 a.m., November 12.
Ms. Snia contends that Dr. Sardisco's failure to place her mother on a cardiac monitor and his failure to rule out heart failure as the actual cause of her distress breached the standard of care practiced by emergency room physicians. She also maintains that but for the absence of the monitor, Mrs. Wallace's irregular heart beat would have been detected sooner thus allowing immediate treatment and thereby increasing her chances of survival.
In a medical malpractice action against a physician, the plaintiff carries a two-fold burden of proof. The plaintiff must first establish by a preponderance of the evidence that the doctor's treatment fell below the ordinary standard of care expected of physicians in his medical specialty, and then must establish a causal relationship between the alleged negligent treatment and the injury sustained. Resolutions of each of these inquiries are determinations of fact. R.S. 9:2794; Martin v. East Jefferson General Hosp., 582 So.2d 1272 (La.1991).
In a situation where the patient dies, the Louisiana Supreme Court has held that the plaintiff does not have to shoulder the "unreasonable burden" of proving that the patient would have lived had proper treatment been given. Hastings v. Baton Rouge General Hospital, 498 So.2d 713, 721 (La.1986). Instead, the plaintiff must prove "only that there would have been a chance of survival", and that the patient was denied this chance of survival because of the defendant's negligence. Id. at 720.
Dr. Sardisco testified detailing his treatment and assessment of Mrs. Wallace's condition. Upon examining her in the emergency room he took into consideration the fact she had received Proventil and Bumex while in route to the hospital. Both drugs were administered to ease her breathing; the former, by opening her air passages and the latter, as a diuretic to reduce the strain on her heart. He noted that her condition on arrival had improved since the first paramedic administrations in the ambulance. Dr. Sardisco ordered oxygen for her and continued to note her improvement. Because she had not urinated even after the Bumex and in light of the diminution of labored breathing, Dr. Sardisco suspected her condition was caused by her asthma, rather than heart failure. He explained that if she were in stages of heart failure, and if there was an accumulation of fluid in her lungs, which there was not, the drugs and oxygen would not have reversed her distress. Instead her breathing improved even in the absence of any diuretic benefit from the Bumex.
Not entirely convinced Mrs. Wallace was suffering from an asthmatic condition, Dr. Sardisco ordered a chest X-ray. The results proved normalher lungs were clear and her heart was not enlarged. Her EKG showed no acute changesno signs of ischemia or heart attack.
Dr. Sardisco explained his administration of Terbutaline as "usually given to elderly people with heart failure or heart disease because it's less toxic on the heart". He chose not to give her an aminophylline drip for fear of toxicity because he was unsure of her home dosage and because it characteristically has a delayed, as opposed to immediate, effect. Test results from the blood gases test indicated her system was improving as far as oxygen absorption was concerned. He considered her pedal edema, swelling of the ankles and feet, as a possible indicator of heart failure but also noted this symptom is found in liver/kidney failure as well as diabetes. He listened to her heart through a stethoscope and heard a "wheeze" which is indicative of asthma rather than a "crackle" noise associated with fluid-engorged lungs precipitated by heart failure.
Drawing upon the test results previously recounted, plus his physical examination and observation of Mrs. Wallace, Dr. Sardisco ruled out the possibility of heart failure or heart attack. In his judgment she was suffering from an asthma attack. As to her cause of death, he concluded she died of a pulmonary embolus; an acute event, sudden and completely unpredictable.
*1293 The video taped deposition of Dr. Phillip L. Rice, Jr. was played for the jury. The plaintiff offered Dr. Rice as an expert in emergency room medicine. In Dr. Rice's opinion Dr. Sardisco "undertreated" Mrs. Wallace and misdiagnosed her condition. Dr. Rice felt Dr. Sardisco lacked the requisite medical training to competently practice emergency room medicine. He criticized Dr. Sardisco's use of Terbutaline as contraindicated in patients Mrs. Wallace's age and his failure to administer an aminophylline drip and inhalation therapy. A review of Mrs. Wallace's record led Dr. Rice to conclude she was suffering from "cardiac asthma", a condition which includes congestive heart failure. He noted her symptomsshortness of breath, wheezing, swelling in her legs and diabetesas firmly indicative of a "primary cardiac event." Dr. Rice stated that standard emergency room procedure calls for a patient in Mrs. Wallace's condition to be placed on a heart monitor.[1] He believed the presence of a monitor "might have helped".
The defense offered Dr. Dean Ellithorpe, a board certified pulmonary specialist, who testified that he specialized in treating and diagnosing patients with respiratory complications such as congestive heart failure and asthma. Dr. Ellithorpe testified that Dr. Sardisco treated Mrs. Wallace properly and within the standard of care expected of an emergency room physician. He testified that Mrs. Wallace had initially been treated for cardiac asthma in route to the hospital when she was given Bumex, a diuretic, and Proventil, for asthma. Since she did not urinate in route to the hospital, he felt that the Proventil, which causes a rapid heart beat, must have helped her asthma. There were no signs of congestive heart failure, such as rales, murmurs, or gallops, upon Dr. Sardisco's examination. He stated that although Mrs. Wallace had swollen feet, it was a non-specific finding which could be caused by diabetes myelitis. He testified that her wheezing could have been congestive heart failure, but it was most likely asthma in the absence of more clinical data.
Dr. Ellithorpe further testified that Dr. Sardisco confirmed his diagnosis of asthma, and ruled out congestive heart failure, by obtaining a chest x-ray which showed a normal heart. Dr. Sardisco ordered an EKG which showed no ischemia. He testified that although the EKG showed left ventricular hypertrophy, it was not indicative of congestive heart failure. The arterial blood gases showed signs of clinical improvement and her respiratory rate decreased from 32 to 26. He further testified that Dr. Sardisco properly ordered her to remain in the emergency room for observation. It was Dr. Ellithorpe's opinion that there was no causal relationship between Dr. Sardisco's treatment and Mrs. Wallace's death. In his opinion, a cardiac monitor would not have helped because Mrs. Wallace died of an unavoidable and unpredictable pulmonary embolus. Furthermore, Dr. Ellithorpe testified the code blue and resuscitative efforts were timely performed.
Next, Dr. Cheryl LeBlanc, a board certified emergency room physician, testified that Dr. Sardisco received no early warning of an impending cardiac or pulmonary event. She agreed with Dr. Ellithorpe that the patient was not in congestive heart failure since no rales, no tachycardia, or neck venous distension, were observed. She was of the opinion that Mrs. Wallace's swollen legs could have been due to a lymphatic obstruction, or chronic venous extension. She felt that the absence of a cardiac monitor did not contribute to Mrs. Wallace's death since she was under constant observation by the nursing staff. She concluded her testimony by stating that she felt that Mrs. Wallace's death was due to an unpredictable and unavoidable pulmonary embolus.
Finally, Dr. Marion Bellecci, a board certified emergency room physician, and physician who served on the medical review panel for this case, testified for the defense. She stated that Mrs. Wallace's principle problem on presentation to the emergency room was bronchial asthma and it was treated appropriately *1294 by Dr. Sardisco. It was her opinion that Mrs. Wallace's death was due to an unavoidable unpredictable cardiac arrhythmia, or a pulmonary embolus. She felt that the blood gases did not suggest that Mrs. Wallace's condition was deteriorating or that she was in respiratory failure. She agreed with Dr. Ellithorpe that the code blue was conducted properly. She concluded by testifying that she felt that Dr. Sardisco met the standard of care.
Nothing in the testimony of plaintiff's expert, Dr. Rice, convinces us Dr. Sardisco's treatment of Mrs. Wallace fell below the standard of skill and knowledge required of an emergency room physician. His testimony concerning the efficacy of Dr. Sardisco's treatment was met and rebutted by Dr. Sardisco and his experts.
Dr. Rice admitted Mrs. Wallace received proper care for suspected asthma but he contradicted himself in assessing whether Dr. Sardisco abandoned any treatment for a cardiac problem. Initially, Dr. Rice stated Dr. Sardisco did not pursue cardiac treatment but later in his deposition "guessed" that Dr. Sardisco treated Mrs. Wallace for a heart problem. Dr. Sardisco's actions, as confirmed by testimony from his experts, specifically attested to the fact that Dr. Sardisco did in fact treat Mrs. Wallace for a heart malady. Dr. Sardisco offered the evidence of the EKG, x-ray and blood gases test as proof he did not rule out the possibility of cardiac involvement.
Dr. Rice stated that Mrs. Wallace should have been placed on a heart monitor. However, in answer to questioning whether the monitor would have aided in a timely detection of Mrs. Wallace's embolus he responded it "might have helped". Dr. Sardisco's expert, Dr. Ellithorpe, emphatically stated the monitor would have made no difference.
In short, there is no indication in the record that Dr. Sardisco's treatment was deficient or below standard or that another course of treatment, including the monitor, would have provided Mrs. Wallace with a chance of survival she otherwise would not have had. Dr. Rice did in fact testify the monitor "might" have helped; however, he did not assess in any detail what the quantitative chances of survival would have been. Although Dr. Rice testified that had Mrs. Wallace been his patient he would have treated her more aggressively, he conceded that a decision to follow a particular course of treatment is largely dependent on the treating physician's judgment formulated on the basis of the physician's findings under the particular circumstances of each case.
The law does not require absolute precision in medical diagnoses. A physician is not required to use the highest degree of skill and care possible, and he does not guarantee a particular result. Mike v. Maxwell, 577 So.2d 1090 (La.App. 1 Cir.1991). The doctor's professional judgment and conduct are evaluated in terms of reasonableness under the circumstances at the time, not in terms of results or in the light of subsequent events. Broadway v. St. Paul Ins. Co., 582 So.2d 1368 (La.App. 2d Cir.1991).
The preponderance of the evidence indicates Dr. Sardisco exhibited the skill and knowledge possessed by emergency room physicians in his treatment of Mrs. Wallace. We believe that Mrs. Wallace died of a sudden, unpredictable event and nothing Dr. Sardisco did or did not do deprived her of a chance of survival.
For the foregoing reasons, we vacate the judgment of the jury and render judgment in favor of Dr. Sardisco, dismissing Ms. Snia's claims. Each party is to bear its own costs of litigation.
VACATED AND RENDERED.
PLOTKIN, Judge, dissenting with written reasons:
Although I agree with the majority's conclusion that the trial court's failure to give the requested instruction on loss of a chance of survival requires that the jury verdict be vacated, I disagree with its conclusion, after its de novo review, that the preponderance of the evidence in the record indicates that Mrs. Wallace was not deprived of a chance of survival by substandard treatment on the part of Dr. Sardisco. Accordingly, I respectfully dissent from that portion of the opinion which dismisses Ms. Snia's claims.
*1295 The majority fails to make a factual determination concerning the preponderance of the evidence regarding the pivotal issue in this casethat is, whether a cardiac monitor was in fact attached to Mrs. Wallace when she arrived at the hospital. Ms. Snia testified unequivocally on rebuttal that no cardiac monitor was attached until after Mrs. Wallace went into acute distress and the "Code Blue" was called. Dr. Sardisco claims, on the other hand, that a cardiac monitor was attached to Mrs. Wallace upon her arrival at the hospital.
However, a close reading of the record indicates that Dr. Sardisco's testimony on this issue was based largely on the fact that Mrs. Wallace was attended by "some good nurses," and the nurses in the operating room routinely attached cardiac monitors to every patient. Further, Dr. Sardisco admitted that the use of a cardiac monitor on Mrs. Wallace was not documented in her hospital record. Although he attempted to explain the omission in the records by claiming that the use of a cardiac monitor is so routine that it is often omitted from emergency room records, he later admitted that the use of cardiac monitor on Mrs. Wallace during an earlier visit to the emergency room was documented in her hospital record.
Thus, the record contains conflicting evidence on this issue. However, my review of all the evidence concerning the use a cardiac monitor convinces me that the evidence preponderates in favor of the plaintiff on this issue. Additionally, I believe that the jury's finding that Dr. Sardisco's treatment fell below the standard of care ordinarily practiced by emergency room physicians was based on its conclusion that the doctor failed to attach a heart monitor to Mrs. Wallace. Certainly that issue was hotly contested at the trial; in fact, the entirety of Ms. Snia's testimony on rebuttal, which was presented at the very end of the trial, concerned this issue. Under the circumstances, I would find that Dr. Sardisco failed to attach a cardiac monitor.
Moreover, I would also find that the failure to attach that heart monitor deprived Mrs. Wallace of a chance of survival. As Dr. Sardisco admitted, Mrs. Wallace's heart condition was well known to him. Although no autopsy was performed, the record indicates that Mrs. Wallace's death was caused by a heart problem, more probably than not. I am aware of the fact that many of the expert witnesses speculated that Mrs. Wallace died of a "sudden event" which could not have been predicted, even if a cardiac monitor had been attached. Nevertheless, it seems apparent to me that the death of an 82-year-old woman with a pre-existing serious heart condition could possibly have been prevented if her treating physician had used a cardiac monitor. In fact, if use of a cardiac monitor was not necessary under the facts of this case, then it is difficult to imagine a factual scenario which would require use of such a monitor. Even Dr. Sardisco stated that use of a cardiac monitor is routine in the emergency room; obviously use of such a monitor routinely assists physicians in saving the lives of their patients, giving their patients a "chance to survive" in situations where they otherwise would not have such a chance. Thus, I believe that the failure to use a cardiac monitor in Mrs. Wallace's case obviously deprived her of that "chance."
My position in this case is supported by this court's recent decision in White v. Touro Infirmary, 633 So.2d 755 (La.App. 4th Cir. 1994). In White, this court affirmed a jury decision awarding damages for loss of a chance of survival to the plaintiffs, survivors of a surgery patient who died from an embolism immediately upon her return home following the surgery. Although that case did not involve the failure to use a cardiac monitor, it does indicate that recovery for loss of a chance of survival is appropriate under factual circumstances even less egregious than those presented by this case. Further, in the White case, as here, the pivotal facts indicating the defendants were negligent in their treatment of the decedent were not reflected in the hospital records. I believe that the majority's conclusions on its de novo review are incorrect under the facts of this case. I would find that the plaintiff is entitled to recovery for the death of her mother caused by the defendants' negligent actions resulting in a loss of a chance of survival.
NOTES
[1] The emergency room records were silent concerning a monitor. Ms. Snia testified there was no monitor; Dr. Sardisco emphatically insisted there was. He explained the absence of a notation to that effect indicating that the placement of monitor is so routine that it is often not indicated in the record.