699 So.2d 102 (1997)
Jean G. WILLIAMS individually and as Natural Tutrix of and on Behalf of her Minor Child, Jean Marie Williams
v.
Dr. David L. GOLDEN, M.D., et al.
No. 95-CA-2712.
Court of Appeal of Louisiana, Fourth Circuit.
July 23, 1997.
As Modified on Grant of Rehearing September 30, 1997.
and As Amended October 8, 1997.
*105 Waltzer & Associates, Joel Waltzer. Bruce C. Waltzer, New Orleans, for Appellants.
Lemle & Kelleher, L.L.P., Albert H. Hanemann, Jr., David M. Whitaker, New Orleans, for Appellees.
Before BARRY, BYRNES and MURRAY, JJ.
BARRY, Judge.
Plaintiff Jean G. Williams, individually and on behalf of her minor child, Jeanne Marie, appeals a judgment in favor of the defendants in this medical malpractice action.[1] Williams sued her gynecologist Dr. David Golden and his insurer, Insurance Corporation of America for damages as a result of his treatment to her and her child Jeanne Marie.[2]
Williams alleged that Dr. Golden inserted a Copper-7 intrauterine device (IUD) in July 1983 and she became pregnant in September 1983. Dr. Golden was unable to remove the IUD after several attempts during her pregnancy. She alleged that he did not properly treat her and she delivered a very premature baby, Jeanne Marie, in her apartment without medical assistance on February 22, 1984. Jeanne Marie remained in the hospital's neonatal intensive care unit for months and had serious problems including intraventricular hemorrhage, hydrocephalus, and cerebral palsy.
The jury concluded that Dr. Golden did not fail to meet accepted standards of medical care when advising or treating Williams. The resulting judgment dismissed Williams' suit. Her motion for a new trial and judgment notwithstanding the verdict was denied.
Williams argues that it was error to instruct the jury that the law presumes a medical doctor possesses reasonable knowledge and skills required by controlling medical standards and applies that skill when treating a patient. Williams also claims the court failed to give counsel the jury charges in a reasonable time before closing arguments. A motion to remand to take evidence on the motion for a new trial was denied by this Court.

JURY INSTRUCTION
A jury instruction as a whole must reflect the applicable law in light of the pleadings and facts of the case. The question is whether the jury was misled to such an extent that it was not able to do justice. Girvan v. New Orleans Public Service, Inc., 94-0681 (La.App. 4 Cir. 11/30/94), 646 So.2d 481, writ denied 94-3169 (La.3/10/95), 650 So.2d 1178. The trial court must instruct the jury as to the law and avoid confusing the *106 jury. Kennedy v. St. Charles General Hospital Auxiliary, 630 So.2d 888 (La.App. 4th Cir.1993), writ denied 94-0269 (La.3/18/94), 634 So.2d 863.
Discovery of an error in a jury instruction does not justify a trial de novo by an appellate court without measuring the gravity and degree of the error and considering the instructions as a whole and the circumstances of the case. Barnett v. New Orleans Public Service, Inc., 489 So.2d 452 (La.App. 4th Cir.1986). When a jury was erroneously instructed and the error probably contributed to the verdict, a reviewing court must set aside the jury verdict. Kibble v. B.P.O. Elks Lodge No.30, 640 So.2d 267 (La.App. 4th Cir.1993), writ denied 94-0922 (La.5/20/94), 641 So.2d 204; Boh Brothers Construction Company, Inc. v. Luber-Finer, Inc., 612 So.2d 270 (La.App. 4th Cir.1992), writ denied 614 So.2d 1256 (La.1993). Only then should a reviewing court make an independent de novo determination of the facts from the record, if possible, without according any weight to the factual findings of the erroneously instructed jury. The manifest error standard is not utilized when a jury's findings are tainted. Picou v. Ferrara, 483 So.2d 915 (La.1986); Gonzales v. Xerox Corporation, 320 So.2d 163 (La.1975).
The heart of this appeal concerns the following jury instructions:
Also, the law presumes that a medical practitioner possessed reasonable knowledge and skills required of him by the controlling medical standards and that in treating the patient he applied that knowledge and skill. This presumption should control your deliberations in this case unless it has been overcome by a showing that, by the greater weight of evidence, Doctor Golden was not so possessed or did not so apply his knowledge and skills.
Williams notes that the defense proposed the instruction (charge 3) and it was given to the jury over her objection. According to the transcript, immediately after the jury was charged and retired, Williams' counsel noted an objection to the charge.[3] Williams correctly contends the instruction is improper under La. R.S. 9:2794. The cases cited by defendants to support the instruction are old cases, see generally Freche v. Mary, 16 So.2d 213, 215 (La.App.1944), and Brashears v. Peak, 19 So.2d 901, 903 (La.App. 1st Cir. 1944), which pre-date La. R.S. 40:1299.41 et seq., the Medical Malpractice Act, and La. R.S. 9:2794 (both enacted in 1975). Those statutes set out the burden in medical malpractice actions.[4]
However, we must look at the jury instruction as a whole. We note that at the beginning of the jury charge the correct law under La. R.S. 9:2794 was given:
In order to prove their case against Doctor Golden, the plaintiffs must prove:
One, The degree of knowledge, or skill possessed or the degree of care ordinarily exercised by physicians practicing in the field of obstetrics/gynecology.
Two, That the defendant either lacked this degree of knowledge or skill, or that he failed to use reasonable care and diligence, along with his best judgment in the application of that skill; and
Three, That as a proximate result of the defendant's lack of such knowledge or skill, or as a proximate result of his failure to exercise reasonable care and diligence, along with his best judgment the plaintiff suffered injuries which would not otherwise have been incurred.
If the plaintiff fails to prove any one of these things, you must render judgment in favor of the defendant.
*107 Following the above instruction the trial court informed the jury that the Medical Review Panel found the evidence did not support a conclusion that Dr. Golden failed to meet the applicable standard of care. Then the court gave the challenged instruction which specifies that it is presumed Dr. Golden possessed the required skill and knowledge and applied it when treating Williams. The instruction further stated that the presumption controls unless it is overcome by "greater weight of evidence" that Dr. Golden did not possess the knowledge or properly apply his skills. It is confusing as to what standard of proof Williams was required to meet.
Placing the erroneous instruction toward the end of the charge supports Williams' contention that the instruction prejudiced the case and resulted in the adverse verdict. The use of "presumption" in the instruction was persuasive as to Williams' burden. We conclude the jury verdict was contaminated by the highly prejudicial instruction. The judgment is reversed and the verdict is set aside. We will conduct a de novo review.

DE NOVO REVIEW

LAW ON LIABILITY
Williams alleged that Dr. Golden committed malpractice. She claimed that he failed to diagnose the onset of early delivery and did not attempt to delay labor. Williams also alleged that Dr. Golden failed to provide adequate information concerning risks to the fetus if she carried to term with an intrauterine device in place. As a result she was deprived of her right to make an informed choice.
In a medical malpractice action a plaintiff faces a two-fold burden: first, to establish by a preponderance of the evidence that the physician's treatment fell below the ordinary standard of care in his medical specialty; second, to prove a causal relationship between the alleged negligent treatment and the resultant injury. La. R.S. 9:2794; Morris v. Ferriss, 95-1790 (La.App. 4 Cir. 2/15/96), 669 So.2d 1316, writ denied 96-0676 (La.4/26/96), 672 So.2d 671; Martin v. East Jefferson General Hospital, 582 So.2d 1272 (La.1991); Snia v. United Medical Center of New Orleans, 93-2367 (La.App. 4 Cir. 5/26/94), 637 So.2d 1290, writ denied 94-1653 (La.10/7/94), 644 So.2d 637.
The Louisiana Uniform Consent Law requires disclosure of the nature and purpose of a medical or surgical procedure together with known risks, if any, of death, brain damage, quadriplegia, paraplegia, the loss of function of any organ or limb or disfiguring scars. La. R.S. 40:1299.40. A doctor is required to provide sufficient information to allow the patient to make an informed and intelligent decision on whether to submit to a course of treatment. The patient should be told the nature of the ailment or condition, the risks involved in the proposed treatment, the risks of failing to undergo treatment, and the risks of alternative treatment. Hartman v. D'Ambrosia, 95-0393 (La.App. 4 Cir. 11/30/95), 665 So.2d 1206, writ denied 95-3124 (La.2/16/96), 667 So.2d 1060, quoting Hondroulis v. Schuhmacher, 553 So.2d 398, 411 (La.1988).
A physician is required to advise a patient of any material consequences which would influence the decision of a reasonable person in the patient's condition. A doctor has a duty to disclose all material risks. The determination of materiality is a two-step process:
The first step is to define the existence and nature of the risk and the likelihood of its occurrence. "Some" expert testimony is necessary to establish this aspect of materiality because only a physician or other qualified expert is capable of judging what risk exists and the likelihood of occurrence. The second prong ... is ... to decide whether the probability of that type harm is a risk which a reasonable patient would consider in deciding on treatment.
Hondroulis, 553 So.2d at 412. There must be a causal relationship between the doctor's failure to disclose material information and a material risk of damage to the patient. An objective standard of causation is used. There must be a determination as to whether a reasonable patient in the plaintiff's position would have consented to the treatment had *108 the material information and risks been disclosed. Id.
It is settled that when a litigant fails to produce available evidence and no reasonable explanation is made, there is a presumption that such evidence would be unfavorable. Boh Brothers Construction, 612 So.2d at 270; Wilson v. U.S. Fire and Casualty Company, 593 So.2d 695 (La.App. 4th Cir.1991), writ denied 597 So.2d 1037 (La.1992). To decide whether to apply the adverse inference, one is guided toward the goal of a fair and equitable judicial process, by the likelihood that the verdict will be based on the truth, and by the need to deter the wrongful, intentional spoliation of evidence in the future. Kammerer v. Sewerage and Water Board of New Orleans, 93-1232 (La.App. 4 Cir. 3/15/94), 633 So.2d 1357, writ denied 94-0948 (La.7/1/94), 639 So.2d 1163.

NON-PRODUCTION OF RECORDS
Williams' medical records were not produced at trial. Dr. Golden stated that he was not custodian of the records because he worked for Gecis Medical Center Corporation which had records personnel. He stated that records were seized from his office on two occasions during a medicaid fraud investigation in 1982 or 1983. Dr. Golden admitted that he saw documents in a manila envelope bearing Jean Williams' name seven or eight years prior to the 1995 trial. Dr. Golden conceded that he had previously testified that he saw the envelope with Williams' name in 1990. Later during trial testimony he said that he saw the envelope three to four years earlier, but could not explain what happened to the envelope. Dr. Golden produced two registration forms bearing Williams' name but no medical record.[5]
Dr. Vincent Culotta, Williams' expert in obstetrics and gynecology, testified that a doctor has the responsibility to preserve a patient's medical records. The patient's original medical records are the property of the doctor as the source of the patient's condition and treatment.
Under these circumstances we are justified to apply an adverse inference and presume that Williams' records would have been unfavorable to Dr. Golden.

TRIAL TESTIMONY
Williams testified that she worked in the office of Dr. Banks and went to Dr. Golden in 1980 for advice relating to contraception. She could not take birth control pills due to a thyroid problem and she also had epilepsy. Dr. Golden recommended an IUD which she used until 1983. In early 1983 Williams became pregnant with the IUD in place. Dr. Golden attempted to remove the device by pulling the string and Williams miscarried. A Copper 7 IUD was inserted and in September, 1983 Williams became pregnant. According to Williams, Dr. Golden was not able to find the string to remove the IUD. He informed Williams that she could abort or might go full-term with the baby; he never warned about a pre-term delivery.[6] According to Williams, in November, 1983 she experienced pain and Dr. Golden ordered an ultrasound at Mercy Hospital which showed the IUD was piercing the placenta. She was never told that she had a high risk of danger as to her pregnancy.
Williams said that on February 19, 1984 she had pain and frequent urination; she "was leaking water." Dr. Golden met Williams at his office and she got on a table, and placed her feet in the stirrups. The doctor put on gloves, used his forearms to open her legs, and inserted his fingers. He failed to see a problem and told her to go to bed and elevate her legs. Williams said that Dr. Golden never put paper for a nitrazine test by her vagina. She said there was no further leakage.
*109 Williams stated that she had abdominal pain on February 21 and called Dr. Golden's office. Debra Jones, Dr. Golden's assistant, said she would ask Dr. Golden to return the call but Williams did not receive a return call. On February 22 Williams had pain and stomach pressure as if she would have a bowel movement. Williams gave birth on her son's bed. Her son called 911 and Dr. Golden's office. Williams' sister arrived and soon after Dr. Golden arrived. According to Williams, Dr. Golden said the baby was dead due to lack of oxygen. The placenta was white and there was a foul odor. Dr. Golden told Williams that she needed antibiotics but she did not need to go to the hospital. An ambulance took the baby, Jeanne Marie, to Charity Hospital and Williams followed in another ambulance (which Dr. Golden allegedly attempted to cancel). Williams continued to bleed and underwent dilatation and curettage the next day.
Dr. Golden testified that in 1983 he was working at the Gecis Medical Center on Palmetto Street; his brother was a part owner. He saw Williams as a patient and knew her personally through his friend and Williams' employer, Dr. Banks. Dr. Golden saw thirty to thirty-five patients a day and delivered thirty babies a month. He did not remember inserting Williams' IUD, but stated that he routinely gave precautions as per the IUD's package. He claimed that he gave the manufacturer's written warnings prior to insertion of an IUD.
At trial Dr. Golden remembered Williams' prior pregnancy and miscarriage with an IUD in place, but testified at a deposition that he did not recall that fact. Dr. Golden stated that a doctor is concerned about premature labor when a woman is pregnant with an IUD in place. He testified that the IUD creates a high risk pregnancy. He conceded at trial that Williams' epilepsy made her a relatively high risk patient. Dr. Golden stated that if a membrane ruptures prematurely, the resultant problems are ascending infection and premature labor. He noted a November, 1983 Mercy Hospital ultrasound report that showed a "linear echogenic structure that may represent an I.U.D." posterior to the placental head. The ultrasound reflected a cyst on the right ovary which may have caused Williams' abdominal pain. He remembered talking to Williams about the report but not scheduling the test. He did not recall making an ultrasound test at his office.
Dr. Golden did not remember Williams' visit on February 19, several days before the baby's birth. In a deposition he stated that he had no recollection of Williams' examination the week before the baby's birth. However, he remembered a nitrazine test for leakage and a negative result. Dr. Golden found no leakage of amniotic fluid and sent Williams home. He said that he did not remember being in the office for the test. Dr. Golden testified that he did not remember a sterile exam with a speculum, but Williams' testimony that he spread her legs with his elbows indicated he used a speculum for a sterile exam. He did not remember a urine test. Dr. Golden stated that he probably would have hospitalized Williams if the nitrazine test had been positive, an indication of a ruptured membrane. Dr. Golden said the standard of care required a nitrazine test when Williams complained of leakage on February 19. Dr. Golden said the objective is to have the fetus reach full term because a premature baby (before thirty-five weeks) will probably have difficulty. Williams' baby was born between 26 and 28 weeks of gestation and, according to Charity Hospital records, weighed one and a half pounds.
Dr. Golden testified that he went to Williams' home after the baby was born. The placenta was in the vagina and Williams was bleeding excessively. The baby had a blue color and he did not think she was breathing. He picked up the baby, paramedics arrived and they took the baby to the hospital. Dr. Golden noted that the placenta appeared white because the baby was premature and it had not stretched out; it was not an indication of infection. He stopped Williams' bleeding and left.
Dr. Golden admitted that his license was suspended due to a conviction for three counts of medicaid fraud.
Aimee Ellen Laws, a paramedic with the first ambulance, testified that the doctor said he did not think Jeanne Marie would live. *110 She wrapped the baby in a towel and placed it inside her coat because it was cold. Laws called for a second ambulance for Williams and brought the baby to Charity Hospital. She testified that there was a "[f]oul odor as would be associated with infection" coming from the mother and baby, but that was not in her report. She could not explain why Williams and the baby had no fever or signs of infection in Charity Hospital's records.
Susan Burrew, a paramedic on the second ambulance, testified that she took Williams to Charity Hospital. According to her report, the second ambulance was cancelled by a police unit because the physician said it was unnecessary, but the ambulance went anyway. On cross-examination Burrew stated that information in the report relating to whiteness and foul odor of the placenta (transported with the baby) was reported by Williams because Burrew never saw the placenta. Burrew's report noted that Williams said she experienced a gush of water from the vaginal region on Sunday and was examined by her doctor. According to the report, Williams said her doctor told her that she did not need to go to the hospital after the baby was born.
Debra Jones, office administrator at Gecis Medical Center in 1984, testified that Williams called Dr. Golden on the morning of February 22,1984 because she had problems. Dr. Golden said Williams should go to his office. Williams said she did not have transportation, but called back minutes later and said she would go to the office. Twenty or thirty minutes later Jones received a call that Williams was delivering the baby at home. Jones verified that the Attorney General's Office seized files (private and medicaid) in December, 1983 and in March, 1984.
Dr. Assaad, the baby's resident at Charity Hospital from February 22-29, 1984, testified (his deposition was read to the jury) that Jeanne Marie weighed 680 grams, was 27 weeks gestational age, cried immediately after delivery, was bruised on the head, was breathing and did not need resuscitation. She was intubated and stabilized by the ER team. Dr. Assaad said Jeanne Marie's diagnosis was neonatal asphyxia, hypothermia, respiratory distress syndrome secondary to prematurity and asphyxia, presumptive sepsis (discounted because the baby showed no signs of infection), and anemia (caused by maternal-fetus bleeding or intracranial hemorrhage).
Dr. Assaad's notes recounted Williams' medical history obtained from ER personnel: she had two prior pregnancies, a healthy eight year old child, and a spontaneous abortion months before when she became pregnant with an IUD in place. Dr. Assaad noted the rupture of Williams' membrane on February 19 could have caused an infection and premature maturation of Jeanne Marie's lungs. According to the records, Williams indicated that she experienced a "creamy vaginal discharge" two days before the membrane ruptured. Dr. Assaad stated that a baby at 26 or 27 weeks gestation usually has premature lungs and hyaline membrane disease which requires a mechanical ventilator until the lungs produce a substance (surfactant) that underlines the alveolar surfaces of a baby's lungs. In such cases on the third day after delivery a 26-27 week baby produces surfactant. Jeanne Marie was put on a ventilator and weaned within a day to room air. She was given three transfusions. Dr. Assaad noted that a chest x-ray showed Jeanne Marie's lungs were more mature than expected (apparently due to the ruptured membrane) and she was breathing on her own. Dr. Assaad stated that the ruptured membrane allowed Jeanne Marie to breathe when she was born at home. The premature or prolonged rupture of the membrane (PROM) can be evidenced by an odor when there is an infection. Premature babies are treated with antibiotics for three days; however, Jeanne Marie's culture was negative and she did not have an infection or fever. Dr. Assaad did not see the placenta or IUD. The ultrasound of Jeanne Marie's head on February 28, 1984 showed bleeding and dilatation of the ventricle of the brain.
Dr. Assaad noted that according to Jeanne Marie's records an ultrasound on March 9, 1984 indicated bilateral intraventricular clots with moderate hydrocephalus. The accumulating fluid increased the size of the ventricle and Jeanne Marie's head enlarged. Dr. Assaad stated that the intracranial hemorrhage *111 and hydrocephalus would not have been prevented by delivery in a hospital; prematurity caused those problems. Dr. Assaad stated that babies at 35 weeks gestation have a 40 to 50 percent chance of such a hemorrhage. Babies at 26 or 27 weeks have a 75 percent chance of intracranial hemorrhage. Bruises on Jeanne Marie's head resulted from a precipitous birth at home. Anemia possibly could have been prevented by delivery in a hospital. Dr. Assaad testified that if Jeanne Marie had remained in utero longer the risk of intracranial hemorrhage and cerebral palsy would have decreased. The records show that by March 17, 1984 the hydrocephalus became severe and then a ventriculoperitoneal shunt was implanted to drain the fluid from the brain into the stomach. Dr. Assaad remembered Jeanne Marie because it was remarkable that she survived.
Dr. Culotta, Williams' expert in obstetrics and gynecology, testified that he reviewed the hospital records, the ambulance reports and Williams' depositions. Dr. Culotta stated that in September, 1983, when Williams discovered she was pregnant, an ultrasound should have been done because the IUD string could not be located. The November 8, 1993 ultrasound showed a mass between the placenta and the uterus which could have been the IUD. The mass was behind the placenta so that fetal deformities were unlikely. However, it had the potential to disrupt the placenta or cause an infection which could trigger pre-term delivery or premature rupture of the membrane. Dr. Culotta (who saw about 20 patients a day) opined that an expectant mother with PROM should be hospitalized except in very special circumstances because of possible infection and the onset of labor. Dr. Culotta said that if PROM occurred, daily evaluations had to be made to decide whether to keep the baby in utero because of the risk of infection. Dr. Culotta testified that PROM causes a premature baby's lungs to mature. Lungs do not mature until 37 weeks, but stress or infection can make them develop sooner. Because Jeanne Marie (at 27 weeks) was able to breathe without a ventilator within 24 hours of birth, Dr. Culotta concluded it was more likely than not that Williams had a ruptured membrane for 36 to 72 hours prior to Jeanne Marie's arrival at Charity Hospital.
Dr. Culotta testified that considering Williams' symptoms on February 19, 1984, Dr. Golden should have inserted a speculum to examine the cervix for fluid, to test the fluid with nitrazine or other tests to determine whether amniotic fluid was leaking. He explained that to perform a nitrazine test the doctor places an inch or two of paper (about 1/4 inch wide) inside the vagina with an instrument. Performing only a digital exam would be below the standard of care. Williams should have been placed in a hospital where she could have been monitored. He said that in 1984 labor could have been stopped and the baby kept in utero in most cases.
Dr. Culotta stated that a doctor has the responsibility to assure there is a system to preserve a patient's records. He said a gynecologist should inform a patient of the risks of an IUD, advise alternatives and make certain she is not pregnant prior to inserting the IUD. If a patient with an IUD becomes pregnant, she must be told about the risk of miscarriage if the IUD is removed or the risks involved in continuing the pregnancy. A patient must be told of possible infection, pre-term labor and delivery (prior to 36 weeks), premature rupture of the membrane, and the possibility of deformities depending on the position of the IUD. An expectant mother should be told about risks related to premature delivery including problems with lungs, eyes and intracranial hemorrhage. All of those risks must be made known to meet the standard of care. According to Dr. Culotta, informing Williams that she could miscarry or carry to term was not adequate and failed to meet the standard of care.
Dr. Nadell, pediatric neurosurgeon at Children's Hospital, saw Jeanne Marie in June, 1984. She was referred for monitoring of neurosurgical problems with the shunt. He said that Jeanne Marie's intraventricular hemorrhage was a result of prematurity. Jeanne Marie has cerebral palsy, a brain dysfunction related to the perinatal brain, and he surmised that something happened before, during or soon after birth. Cerebral *112 palsy was the result of prematurity and can cause motor skill problems and learning disabilities.
Dr. Dickey, a defense expert gynecologist and member of the medical review panel, testified by video deposition. He noted that Dr. Golden's medical records were not before the medical review panel. Dr. Dickey noted that neither Williams nor Jeanne Marie showed a sign of infection at the hospital. He said that an IUD could cause complications and the consequences were not unexpected. Relying solely on Dr. Golden's narrative, Dr. Dickey concluded that Dr. Golden could identify the IUD string in September when Williams learned that she was pregnant, but not later. Dr. Golden therefore ordered the ultrasound in November, 1983 and on February 19, 1984 Williams was threatened with premature delivery. Dr. Golden examined her, found no signs of labor progressing, did a nitrazine test which was negative, and prescribed bed rest. It was not necessary to do a urinary infection test.
Dr. Dickey reviewed 1982, 1983 and 1984 IUD literature provided by manufacturers to determine what risks should be told to a patient. The literature noted the risk of sepsis, the development of an infection and possible death of the mother, and the risk of a spontaneous abortion. There was no mention of premature delivery relating to the copper 7 IUD which Williams used. Therefore, he felt Dr. Golden's warning was sufficient and he met the standard of care.
Dr. Weather, a defense expert obstetrician and gynecologist and member of the medical review panel, stated that based on his experience and publications available in 1983 and 1984, a doctor was required to warn a patient who was pregnant with an IUD in place that she could carry full term or miscarry. He stated that Williams' allegation in her original petition that Dr. Golden said he hoped she could hold out to seven months referred to the possibility of a pre-term delivery.
Dr. Weather noted that Dr. Golden saw Williams more often than regular patients and went to his office on a Sunday to examine her. An examination on February 19 would have shown whether the patient had ruptured the membrane, broken the water bag, or had leakage, and the nitrazine and other tests would have been more accurate. He accepted Dr. Golden's claim that he did a proper exam and nitrazine test and found no PROM indications. Dr. Weather concluded that Dr. Golden met the standard of care, but acknowledged that his opinions were based on Dr. Golden's deposition testimony and statements.
Dr. Miller, defense obstetrician and gynecologist, testified that it would be difficult to say that an IUD was related to Williams' early delivery. A pregnant patient with an IUD usually loses the baby early or goes fullterm. Premature deliveries late in pregnancy but when the baby does not weigh five and a half pounds were not and are not a major occurrence although it does happen. Dr. Miller pointed out that an IUD was not found at or after delivery, and the device was not evident in a February 22, 1984 x-ray at Charity Hospital. He said it could have fallen out weeks before delivery or come out with the afterbirth. Most pregnancies are terminated in the first three months due to an IUD. Once an expectant mother passes three months, loss of the baby in the first half of the pregnancy is associated with infection and a septic abortion occurs. According to hospital records reviewed by Dr. Miller, Williams had no infection.

LIABILITYANALYSIS
Dr. Culotta testified that a woman who becomes pregnant with an IUD must be told of the risk that an infection will ascend from the vagina to the uterine cavity. She must be told that there is a risk of spontaneous abortion or pre-term delivery. The expectant mother must be told about possible consequences associated with a premature delivery including intracranial hemorrhage, and problems with lungs and eyes. Drs. Dickey and Weather stated that advising Williams that she might abort or go full-term was sufficient at the time. However, Dr. Golden conceded in trial testimony that preterm delivery was a concern when a patient was pregnant with an IUD in place and the outer and/or inner membrane could rupture with serious consequences. Dr. Golden did not state that he informed Williams of all *113 those risks in September, 1993 when she became pregnant. Williams stated that she was not told about a possible premature delivery and the problems associated with premature rupture of the membrane (PROM).
The record shows that Williams carried her burden that she was not adequately informed of the risks of continuing the pregnancy with the presence of the IUD.
Williams also proved malpractice. Dr. Culotta testified that Dr. Golden should have ordered an ultrasound in September, 1983 when the IUD string could not be located. Dr. Dickey said an ultrasound was not necessary and relied upon Dr. Golden's assertion that the string could be identified. Williams testified that Dr. Golden could not find the string. Dr. Culotta stated that on February 19, 1984, based on Williams' symptoms, Dr. Golden was required to conduct a nitrazine test and due to PROM Williams should have been hospitalized because of infection and the possible onset of labor. It appears Williams was suffering from premature rupture of the membrane at that time. Williams testified that she leaked water on February 19 and Burrew's ambulance run report noted that Williams told her that she experienced a gush of water that day. Dr. Culotta stated that the fact that Jeanne Marie could breathe with a ventilator within 24 hours of birth, made it more likely than not that Williams' membrane raptured 36 to 72 hours prior to the baby's arrival at the hospital. Dr. Assaad, testified that Williams' ruptured membrane days earlier caused the premature maturation of Jeanne Marie's lungs; PROM caused the lungs to mature and allowed Jeanne Marie to breathe when she was born at home. Dr. Nadell linked Jeanne Marie's cerebral palsy and intracranial hemorrhage to her prematurity. Dr. Culotta stated that in 1984 labor could have been stopped in most cases.
Drs. Dickey and Weather relied upon Dr. Golden's statements in the narrative submitted to the medical review panel and his deposition testimony. However, the fact that Jeanne Marie's lungs were mature established that Williams' membrane ruptured and discredited Dr. Golden's testimony relating to negative nitrazine test results. We note Dr. Golden's prior conviction(s) for medicaid fraud.
Our de novo review convinces us that Dr. Golden's treatment fell below the ordinary standard of care and Williams and Jeanne Marie are entitled to damages.

QUANTUM
General damages do not have a common denominator and are decided on a case by case basis. They involve physical and mental pain and suffering, inconvenience, loss of intellectual gratification or physical enjoyment, and other factors that affect a victim's life. The factors to consider when assessing quantum for pain and suffering are severity and duration. Glasper v. Henry, 589 So.2d 1173 (La.App. 4th Cir.1991), writ denied 594 So.2d 1315 (La.1992).
Jeanne Marie Cordier suffered an intracranial hemorrhage and hydrocephalus, which is swelling of the brain due to excess fluid. A shunt or long tube was implanted at Charity Hospital in March, 1984 to drain spinal fluid from Jeanne Marie's brain to her abdomen. Dr. Nadell began treatment in June, 1984. In March, 1986 at two years old she had an obstruction and Dr. Nadell removed the shunt from the right side and placed a new one on the left side. In September, 1989 Jeanne Marie experienced symptoms consistent with failure of the shunt including headaches, vomiting, and sleepiness. Dr. Nadell changed the catheter that went into her brain. In June, 1991 Jeanne Marie suffered similar symptoms but the catheter could not be removed. Instead, Dr. Nadell placed another catheter next to the original. In January, 1994 Jeanne Marie again had symptoms, but the catheter could not be removed. Dr. Nadell cleared the shunt which lasted two weeks. In February, 1994 a third catheter was placed into Jeanne Marie's brain. The six procedures required general anesthesia and hospital stays of at least three to four days for each procedure. Dr. Nadell testified that Jeanne Marie would require continued medical supervision and additional shunt revisions. He stated that there is a risk with each surgery, especially infection.
*114 Dr. Nadell stated that Jeanne Marie has cerebral palsy, a brain dysfunction which causes difficulties with motor skills and sometimes learning disabilities. He said that Jeanne Marie could not participate in contact sports and she has other limitations.
Williams stated that after birth Jeanne Marie was in the hospital about three months and was not allowed visitors the first week. After that Williams visited every day, sometimes two or three times a day which disrupted her life. Her son was not able to see Jeanne Marie and she felt helpless. Williams said that Jeanne Marie's grades are average, but she is forced to miss school for up to two weeks during surgeries. Jeanne Marie cannot skate or ride a bicycle. She cannot be a cheerleader or play volleyball.
Gregory Cordier, Jeanne Marie's father who lived with Williams for fifteen years, testified that the time right after Jeanne Marie's birth was very difficult. Williams was at the hospital as much as possible and they did not know if the baby Would survive. Jeanne Marie requires special care, cannot participate in physical activities, and has to be careful. Cordier said that it is difficult to deal with Jeanne Marie's symptoms when the shunt fails, the actual surgeries, and the emotional and physical toll it takes on the child and family.
Jeanne Marie testified that she knew when the shunt was failing because she would feel a slight pain in her head and would get very sleepy. She stated that she had a lot of pain and mucous when the shunt failed in February, 1994. In January, 1994 she vomited prior to the revision. When she underwent surgery part of her head was shaved. Jeanne Marie said that she liked to play sports especially volleyball and wanted to be a cheerleader, but could not.
Jeanne Marie has suffered extraordinary pain from birth. She has been deprived of a normal childhood and will experience pain the rest of her life. Her particular problems are unique and an award must encompass her past miseries and a limited future lifestyle. In Housley v. Cerise, 597 So.2d 71 (La.App. 4th Cir.1992), writ denied 600 So.2d 646 (La.1992), a premature infant suffered an intraventricular hemorrhage (which resolved in three weeks and did not require a shunt), was developmentally delayed, developed cerebral palsy and was awarded $250,000 in general damages. In Bower v. Schumpert Medical Center, 618 So.2d 600 (La.App. 2d Cir.1993), an infant who suffered from neonatal asphyxia resulting in cerebral palsy and spastic quadriplegia was awarded $357,000 in general damages and $198,000 for past custodial care. Neither cited case encompassed the multiple damages suffered by Jeanne Marie or the mental anguish of the mother. Considering the multiple damages to Jeanne Marie, we set her award at $500,000.00.
Ms. Williams delivered the baby at home without medical assistance and she did not know if Jeanne Marie would survive. She suffered for months after Jeanne Marie's premature birth and for years tending to her child's handicaps. Williams will continue to carry the burden of this tragedy because Jeanne Marie cannot function normally. We set the general damage award to Williams at $100,000.00. See Housley, 597 So.2d at 74, where the mother was awarded $35,000.00 for increased pain during labor and delivery and for emotional worry and concern.
It was stipulated that Jeanne Marie's past medical expenses were $54,303.18 and her future medical expenses will be $11,550.00. We award $65,853.18 for past and future medical expenses.

DECREE
IT IS ORDERED that there be judgment in favor of plaintiff Jean G. Williams as natural tutrix of Jeanne Marie Cordier and against defendants David L. Golden and Insurance Corporation of America in the sum of $500,000.00 plus legal interest from February 20, 1985, subject to a maximum aggregate liability on the part of David L. Golden and Insurance Corporation of America of $100,000.00 plus legal interest, if any, in accordance with law.
IT IS FURTHER ORDERED that there be judgment in favor of Jean G. Williams individually and against defendants David L. Golden and Insurance Corporation of America in the sum of $100,000.00 plus legal interest from Feb. 20, 1985 plus stipulated *115 medical expenses of $65,853.18, subject to a maximum aggregate liability (in addition to maximum aggregate liability of Paragraph 1 above) on the part of David L. Golden and Insurance Corporation of America of $100,000.00 plus legal interest, if any, in accordance with law.
IT IS FURTHER ORDERED that cost are assessed against the defendants.
NOTES
[1] The child is referred to in the record as Jean Marie and Jeanne Marie Williams, the petition uses Jean Marie Williams, but documents note her name as Jeanne Marie Cordier. In the transcript she states her name is Jeanne Marie Cordier and in the judgment the child is Jeanne Marie Cordier. Other witnesses' names have different spellings; the names in the transcript are used in the opinion except for Gregory Cordier, whose correct name appears in the documents.

Jean Williams included in the motion and order of appeal the judgment denying her motions for new trial and for judgment notwithstanding the verdict. That judgment is not generally appealable and Williams makes no arguments relating to that judgment.
[2] Defendant Dr. David Golden was also sued as David Golden M.D., A Professional Corporation d/b/a GECIS Medical Center d/b/a Gesis Inc. USA. Williams sued Dr. Assaad Assaad, a number of pharmaceutical companies, the City of New Orleans, the NOPD emergency medical services and an ambulance attendant, DHHR and Charity Hospital. All were dismissed but Dr. Golden and his insurer. Attorney Lawrence Smith intervened for a fee based on quantum meruit for legal work done and monies expended. Although a motion to sever was granted, his intervention was dismissed in the judgment. There is no argument relating to that part of the judgment.
[3] Williams also claims that her counsel had objected to the instruction in chambers.
[4] We disapprove of an instruction based on Meyer v. St. Paul-Mercury Indemnity Company, 225 La. 618, 73 So.2d 781 (1954) and its progeny (which pre-date the Medical Malpractice Act), which stated the locality rule and declared the following is applicable to the standard of care: "[I]t is `incumbent on the physician, surgeon or dentist who becomes defendant in a malpractice case to show that he is possessed of the required skill and competence indicated and that in applying that skill to the given case he used reasonable care and diligence along with his best judgment.' " Foster v. St. Paul Fire and Marine Insurance Company, 212 So.2d 729, 732 (La.App. 4th Cir.1968), quoting Uter v. Bone and Joint Clinic, 249 La. 851, 192 So.2d 100, 102 (1966).
[5] In brief the defense noted that Williams did not produce her diary or daily log upon request. At trial the defense focused on a diary, but withdrew its request for production after Williams testified that she only made notes on pieces of paper.
[6] The defense points out Williams' original petition stated that Dr. Golden told her "she `would probably miscarry' but he `hoped she could hold out till 7 months.'" The defense pointed to Williams' deposition testimony that Dr. Golden said that if the string were pulled the pregnancy might be terminated and it was possible the baby could go full term.